520 A.2d 926

Commonwealth of Pennsylvania, Department of Health, Petitioner *v.* Brownsville Golden Age Nursing Home Inc., Respondent.

Argued February 3, 1986, before Judges CRAIG and COLINS, and Senior Judge BARBIERI, sitting as a panel of three.

*Stephen D. Tompkins,* Assistant Counsel, with him, *David H. Ward* and *Carol Brayshaw Longwell,* Assistant Counsels, and *Ruth M. Siegel,* Chief Counsel, for petitioner.

*Robert L. Webster, Webster & Webster,* for respondent.

OPINION BY SENIOR JUDGE BARBIERI, February 4, 1987:

Following is the opinion of this Court upon reconsideration, in light of *Estate of McGovern v. State Employees' Retirement Board,* 512 Pa. 377, 517 A.2d 523 (1986), of our opinion filed October 15, 1986.

The Department of Health (Department) appealed to this Court the adjudication and order of the State Health Facility Hearing Board (Board) lifting the suspension imposed by the Department on new admissions to Brownsville Golden Age Nursing Home, Inc. (Brownsville) and refusing to revoke Brownsville's license to operate a skilled nursing facility.[1]

---

[1] Although the effect of the Board's order is as stated in the initial paragraph of this opinion, the Board's order in fact *reverses* the Department's orders suspending new admissions and directing Brownsville to show cause why its license should not be revoked, which it would not do as a trial adjudicatory body.

The Department, on July 17, 1984, subsequent to state and federal surveys conducted at Brownsville June 18-20, 1984 and May 30-31 to June 1, 1984, respectively, to determine compliance with state and federal licensing standards, issued an order suspending indefinitely further admission of nursing patients to Brownsville and an order directing Brownsville to show cause why its license should not be revoked.[2] Both orders issued upon the Department's determination that Brownsville was guilty of (1) a serious violation of the provisions of the Health Care Facilities Act[3] (Act), and the regulations for licensure, (2) a cyclical pattern of deficiencies over a period of two or more years, and (3) serious violation of the laws relating to medical assistance and medicare reimbursement. Sections 811(1), (2) and (9) of the Act, 35 P.S. §§448.811(1), (2) and (9). The orders indicated that Brownsville was entitled to request an administrative hearing before the Board; Brownsville was further advised that the orders would

---

[2] The Department erred procedurally when it issued the rule to show cause pursuant to 1 Pa. Code §35.14. The Health Care Facilities Act, Act of July 19, 1979, P.L. 130, *as amended*, 35 P.S. §§448.101—448.904, at Section 811, 35 P.S. §448.811, authorizes the Department to revoke a health care facility's license. Section 805, 35 P.S. §448.805, as will be explained below, authorizes the Board, upon appeal from such revocation order, to hold an evidentiary hearing and issue an adjudication. Thus, the Department is entrusted with more than a prosecutorial function with regard to licensure of health care facilities in Pennsylvania. The Department makes preliminary decisions with regard to licensure in the form of an order which is then appealable to the Board. Subsequent to the hearing before the Board, at which both parties have had opportunity to present evidence in support of their respective positions, the Board issues an adjudication which includes findings of fact, conclusions of law, and an order which either upholds or vacates the Department's order.

[3] Act of July 19, 1979, P.L. 130, *as amended*, 35 P.S. §§448.101—448.904.

become final should Brownsville fail to request a hearing. Brownsville thereafter filed Notices of Appeal with the Board, and on November 8, 9, 26, 27 and December 18, 1984, the Board heard testimony on Brownsville's appeal.

In its adjudication issued March 27, 1985 prior to addressing the substantive issues raised, the Board addressed its role generally in licensure appeals reaching the Board pursuant to Section 805(a) of the Act, 35 P.S. §448.805(a). The Board decided, based upon its analysis of key portions of the Act plus the regulations governing procedure in appeals brought before the Board, that, even though it had in two prior cases evaluated the evidence submitted pursuant to the substantiality of the evidence test, its proper role was that of fact-finder rather than reviewing authority, and, therefore, the proper standard by which to evaluate the evidence presented was preponderance of the evidence. Thus, the Board concluded that the Department had not met its burden of proving by a preponderance of the evidence that Brownsville was guilty of serious violations of the Act and accompanying regulations, of serious violations of the laws relating to medical assistance or medicare reimbursement, or of a cyclical pattern of deficiencies. This appeal followed.

## I. Contentions of Department

On appeal, the Department argued that because the Board's only two prior decisions regarding licensure appeals indicated that the Department's decision would be affirmed if supported by substantial evidence, when the Board failed to notify the Department in advance of the hearing that the Department would be required to establish its essential allegations by a preponderance of the evidence, it violated the Department's right to due process. The Department also argued that the Board

erred as a matter of law when, during the hearing, the Board refused to designate Dr. DiLeo, Brownsville's Medical Director at the time of the surveys, subpoenaed to testify by the Department, a hostile witness, and when the Board ruled that the Department's witnesses could not expand on their testimony regarding the violations they observed during the relicensure survey of Brownsville by giving their opinions as to the seriousness of the observed violation. Finally, the Department argued that the Board's findings of fact, including the findings that Brownsville had committed no serious violations and that the Department had not established a pattern of deficiencies, are not supported by substantial evidence of record and that those findings are inconsistent with the Board's contingent conclusion, expressed in its discussion following its findings of fact, that, had the Department issued Brownsville a provisional license, the Board would have affirmed.

## II. BOARD'S DUAL ROLE UNDER THE ACT

Before we reach the Department's due process argument, we first discuss the Board's fact-finding role in licensure appeals, as distinguished from its reviewing role in Certificate of Need[4] (CON) appeals. The Health Care Facilities Act establishes both the CON program and the licensure program, and places both under the aegis of the Department. Appeals in both kinds of cases proceed to the Board.

---

[4] Section 701 of the Act, 35 P.S. §448.701 prohibits any person from offering, developing, constructing or otherwise establishing within Pennsylvania a new institutional health service without first obtaining a certificate of need from the Department. "New institutional health service" includes construction of a health care facility, a significant expenditure on behalf of a health care facility, the addition of a health service, and major medical equipment.

In CON appeals, the appellant is prohibited under the Act from raising any issue before the Board which was not raised before the health systems agency, which makes the preliminary decision regarding CONs, or the Department. Section 506 of the Act, 35 P.S. §448.506. The statute specifically provides that "the [B]oard shall entertain no evidence that the [H]earing [B]oard is satisfied the appellant was able, by the exercise of reasonable diligence, to have submitted before the health systems agency and the [D]epartment." The reviewing role of the Board with regard to CON appeals is explained by reference to Sections 703 and 704 of the Act, 35 P.S. §§448.703 and 448.704, which provide opportunity for a hearing in connection with a CON application either before the health systems agency or the Department prior to the hearing before the Board. At that hearing, any person is permitted to present oral or written arguments and relevant evidence. While responsibility for holding the hearing is delegated under Section 704 to the health systems agency, if no provision is made for the hearing by the health systems agency, the Department must hold the hearing. Thus, 35 Pa. Code §197.45, a procedural rule specifically applicable to CON appeals, entitled "Scope of Review," instructs that the Board will limit its *review* of Departmental CON decisions to three issues, one of which is whether the Department's decision is supported by substantial evidence. *See Rehab Hospital Services Corporation v. Health Systems Agency of Southwestern Pennsylvania,* 82 Pa. Commonwealth Ct. 147, 475 A.2d 883 (1984).

No such restrictions are placed on the Board with regard to licensure appeals, however. Section 805, 35 P.S. §448.805, provides that the Board has the power and the duty to hold *evidentiary* hearings and issue adjudications in accordance with the Administrative Agency Law, 2 Pa. C. S. §§501-508, 701-704, and the

Board's procedural rules upon appeal from an order of the Department relating to licensure. Board procedural rules describing the procedure at licensure hearings provide that the Department shall have the burden of proof in licensure appeals and that parties to the proceeding shall have the right of presentation of evidence and cross-examination. 37 Pa. Code §197.90.

Thus, the Board has two distinct roles under the Act, depending upon the subject matter of the appeal before it. In CON appeals, on the one hand, it is a reviewing body restrained in its decision-making by its scope of review. In licensure appeals, on the other hand, the Board acts as a trial adjudicatory body; it hears all competent testimony, accepts relevant documentary evidence into the record, and, after hearing, weighs the evidence, makes findings of fact and conclusions of law according to the preponderance of the evidence and issues an order consistent with those findings and conclusions.

The Board's eleventh hour recognition of its alternative roles *in* its adjudication does constitute a violation of the Department's due process rights, however. The Department presented its evidence on each of five days of hearings in reliance upon assertions in the Board's only two prior licensure decisions that the Department's burden was to establish the validity of its orders by substantial evidence. When the Board informed the Department otherwise subsequent to the hearing, the Department was deprived of a vital right. The constitutional guarantee of due process of law is as equally applicable to administrative proceedings as it is to judicial proceedings, *Begis v. Industrial Board of the Department of Labor and Industry,* 9 Pa. Commonwealth Ct. 558, 308 A.2d 643 (1973), and a right to due process means a right to know how the proceedings shall be conducted, in addition to knowing when the proceedings shall be conducted. While we would ordinarily re-

mand the case to the Board for a new hearing to cure the due process violation, because upon review we find error on the part of the Board with regard to its findings, we will vacate the Board's order and, in this case, direct the Board to enter an order revoking Brownsville's license,[5] thereby eliminating the need for a remand.

## III. THIS COURT'S SCOPE OF REVIEW OF BOARD DECISIONS

Our scope of review in agency appeals has been statutorily defined. Section 704 of the Administrative Agency Law, 2 Pa. C. S. §704, requires that we affirm the adjudication of a Commonwealth agency unless we find that it is not in accordance with law or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. *See Estate of McGovern v. State Employees' Retirement Board,* 512 Pa. 377, 517 A.2d 523 (1986).

We have interpreted Section 704 to require that all necessary findings sufficient to resolve the issues raised by the evidence be supported by substantial evidence. As our Supreme Court stated in *Page's Department Store v. Velardi,* 464 Pa. 276, 346 A.2d 556 (1975):

When the fact finder in an administrative proceeding is required to set forth his findings in an adjudication, that adjudication must include all findings necessary to resolve the issues raised by the evidence and which are relevant to a decision. An appellate court or other reviewing

---

[5] Had the Department followed the correct procedure and issued an order revoking Brownsville's license rather than issuing the rule to show cause, we could have reinstated the Department's revocation order. Because the Department issued the rule to show cause, we will direct the Board, in accordance with the powers vested in this Court by Section 706 of the Judicial Code, 42 Pa. C. S. §706, to enter an order revoking Brownsville's license.

body should not infer from the absence of a finding on a given point that the question was resolved in favor of the party who prevailed below for the point may have been overlooked or the law misunderstood at the trial or hearing level. 464 Pa. at 287, 346 A.2d at 561.

Likewise, all necessary facts found by the Board must be supported by substantial evidence of record. "Substantial evidence" has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Murphy v. Department of Public Welfare*, 85 Pa. Commonwealth Ct. 23, 480 A.2d 382 (1984).

> '. . . [S]ubstantial evidence should be construed to confer finality upon an administrative decision on the facts when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, *might* have reached the decision; but, on the other hand, if a reasonable man, acting reasonably, *could not* have reached the decision from the evidence and its inferences then the decision is not supported by substantial evidence and it should be set aside.'

*A. P. Weaver & Sons v. Sanitary Water Board,* 3 Pa. Commonwealth Ct. 499, 505, 284 A.2d 515, 518 (1971) quoting B. Stason, *"Substantial Evidence" in Administrative Law,* 89 U. Pa. L. Rev. 1026, 1038 (1941).

We find, upon review, that the facts found by the Board fail to properly resolve all the issues raised by the surveys and are not supported by substantial evidence. Prior to listing those facts, however, we undertake a general discussion of the regulations governing skilled nursing facilities and the deficiencies observed as testified to by the surveyors, and in this way, outline the issues raised in the appeal to the Board.

IV.   STATE REGULATIONS APPLICABLE TO SKILLED NURSING
FACILITIES AND DEFICIENCIES FOUND BY STATE SURVEYORS

Department regulations are divided into the follow-
ing categories: ownership and management, 28 Pa.
Code §§201.11-201.38; physical plant and equipment
standards which include buildings and grounds, me-
chanical and electrical requirements, and furnishings,
equipment, and supplies, 28 Pa. Code §§205.1-205.91;
housekeeping and maintenance standards, 28 Pa. Code
§§207.1-207.5; fire protection and safety programs, 28
Pa. Code §§209.1-209.8; program standards for infec-
tion control, for medical services and for dietary and
pharmaceutical services, 28 Pa. Code §§211.1-211.22;
and program standards specifically addressing total pa-
tient care, 28 Pa. Code §§213.1-213.30.

The state surveyors, as a result of their June, 1984
survey of Brownsville, found the following deficiencies
with regard to ownership and management of Browns-
ville. 28 Pa. Code §201.25(c) requires that there shall be
inservice training for the facility's personnel in such
areas as infection control, fire protection and safety, ac-
cident prevention, confidentiality of patient information,
psychosocial needs of patients, restorative nursing tech-
niques, and preservation of patient dignity, including
protection of his privacy and personal property rights.
The survey team found that, in the year preceding the
survey, inservice programs on infection control, and on
psychosocial needs of patients had not been held nor
had the facility's pharmacist conducted an inservice pro-
gram for the nursing staff in the preceding year. The
survey team found Brownsville was deficient with
regard to 28 Pa. Code §201.27(a) which provides that
the facility shall have written policies and procedures
for notification of the physician in the event of a signifi-
cant change in the patient's physical, mental or emo-
tional status. The survey team found that several medi-

cal records of patients indicated that no physician had been contacted when there were significant changes in the patients' status and the team listed specific examples. Also under ownership and management, the survey team found Brownsville deficient with regard to 28 Pa. Code §201.34(o), which requires a patient be treated with consideration, respect, and full recognition of his dignity and individuality, including privacy in treatment and in care for his personal needs. The team noted its observations of a patient being assisted to the toilet in full view from the hallway and patients improperly dressed or dressed in nightclothes in the middle of the day.

Under the category, physical plant and equipment, the state survey team observed numerous deficiencies regarding the following regulations. The team found Brownsville deficient with regard to 28 Pa. Code §205.24(j), which requires each patient room having more than one bed to have curtains of sufficient length to afford privacy for the patient. The regulations, at 28 Pa. Code §205.31(f) require that provisions be made for a safe and sanitary method of handling and storage of linen. The survey team observed that linens at Brownsville were not handled, stored or transported in a manner to prevent the spread of infection. Specifically, the team observed soiled linen on the floor and dirty uncovered hampers filled with soiled linens. 28 Pa. Code §205.32(a) requires a minimum amount of recreation space determined by the number of beds in the facility. The team observed wheelchairs and a large table occupying most of the space in the second floor lounge. Section 205.63(b) requires hot and cold potable water at every water outlet; the team noted the absence of a hot water supply in one of the toilet rooms. Section 205.66(g) requires ventilation by means of windows if mechanical ventilation is not possible; the survey noted

a toilet room without ventilation because the window was painted shut. The team noted numerous violations of 28 Pa. Code §§205.67(b), (i), and (1), respectively requiring electrical lighting in all spaces occupied by people, machinery and equipment, reading lights for each patient, and visible call signals to be activated in the hall outside each patient's room. The team noted, with regard to 28 Pa. Code §205.72(i) requiring that all furniture be kept clean and safe for use, a bedside stand the front legs of which were broken off. Finally, the team noted that Brownsville did not have a sufficient supply of linens pursuant to 28 Pa. Code §205.74(a) which requires a supply sufficient for three changes of linen per patient per day.

Under the category of housekeeping and maintenance, the survey team noted deficiencies with regard to Sections 207.3(a) and (c), 207.4(3), and 207.5(b) requiring, respectively, that the interior and exterior of the facility be maintained in a clean, safe and orderly manner in accordance with accepted practices and procedures of good institutional housekeeping, that ice be handled in a sanitary manner to prevent contamination, and that all buildings be maintained in good repair and free of hazards. The team noted heavy accumulations of dust, dirt and litter inside and outside the facility. The team also made the following observations. A janitor's closet was unlocked and the containers inside the closet were not labelled. Live insects were observed in the basement. Windows were open and unscreened. On the floor beside a patient's bed was a napkin smeared with a substance which appeared to be fecal material. A toilet was smeared with a substance which appeared to be feces. There was a leak from the roof causing water to drip in the stairwell from the third floor to the first floor. Plaster was missing from the walls which were cracked.

Under the category fire protection and safety, Section 209.8(a) requires that fire drills be held four times a year per shift. The survey team noted Brownsville had held an insufficient number of fire drills.

Under that group of regulations providing program standards with regard to infection control, medical, dietary and pharmaceutical services, the survey noted deficiencies with regard to Sections 211.1(d), 211.8(a), 211.15(c), 211.16, 211.19, 211.21, and 211.22. Section 211.1(d) requires that the facility's Infection Control Committee, whose formation the regulation mandates, monitor staff performance to ensure that its written policies and procedures are executed. Section 211.8(a) sets forth the minimum contents for each patient's medical record, required to be kept pursuant to Section 211.7. The survey team observed four medical records lacking discharge summaries, three lacking dated documentation that death had occurred, four lacking documentation that the physician had been notified that the patient had "ceased to breathe," four lacking dietary assessments, and four lacking reasons why medication was ordered to be administered as needed. Section 211.15(c) requires that a therapeutic diet manual, jointly approved by the dietician and medical staff, be readily available to attending physicians and nursing and dietetic service personnel. Section 211.16 requires that three meals be served at regular times daily. Section 211.19(b) requires that food be stored, prepared, distributed, and served under sanitary conditions. The survey team observed a generally dirty and unkempt dietary facility. Section 211.21(d) provides that there shall be a signed, dated, written *physician* order for any physical restraint. The survey team observed that Brownsville permitted nurses to order restraints. Section 211.22(h) requires that physicians' telephone and oral orders for medications be given only to certain au-

thorized persons who shall record the orders on the patient's medical record and be countersigned by the prescribing/attending physician within forty-eight hours; the survey team observed that telephone and oral orders were not being countersigned.

Under the category establishing program standards with regard to nursing care, the survey team found deficiencies with regard to Sections 213.4, 213.5(d) and 213.26. Section 213.4 requires that a patient care plan for each patient be developed, consonant with the attending physician's plan of medical care, which shall indicate the care to be given and goals to be accomplished. Section 213.5(d)(3) explains that one of the Director of Nursing's responsibilities is the nursing policy and procedure manuals. The team noted errors and omissions in the manual. Section 213.26 requires that the facility provide an activities program appropriate to the needs and interests of each patient, to encourage self-care, resumption of normal activities and maintenance of an optimal level of psychosocial functioning. The survey team observed no one-to-one or small group activities for those patients who do not wish to attend large group activities.

V. FEDERAL REGULATIONS APPLICABLE TO SKILLED NURSING FACILITIES AND DEFICIENCIES FOUND BY FEDERAL SURVEYORS

The Department issued its rule to show cause, in effect a revocation order, based on Section 811(9) of the Act, 35 P.S. §448.811(9), as well, which permits such revocation in the event of serious violations of the laws relating to medical assistance or medicare. Section 1122 of Title XI of the Social Security Act, 42 U.S.C. §1312, part of the general provisions applying to both Medicare and Medicaid, directs the Secretary of the federal Department of Health and Human Services to develop

standards as to the level, content and quality of medical care to assist states participating in the federal programs in improving their public assistance medical care programs. Pursuant to the above statute, and to Section 1156, 42 U.S.C. §1320c-5, making it the obligation of any health care facility participating in the medical assistance programs to assure that its services meet recognized standards of quality health care upon penalty of exclusion from eligibility to provide such services, federal conditions of participation were promulgated at 42 C.F.R. §§405.1101-405.1137. The federal survey of Brownsville on May 30, 31, and June 1, 1984, resulted in the cancellation of Brownsville's provider agreement due to Brownsville's failure to meet the following seven conditions of participation: governing body and management, 42 C.F.R. §405.1121; nursing services, 42 C.F.R. §405.1124; dietetic services, 42 C.F.R. §405.1125; social services, 42 C.F.R. §405.1130; patient activities, 42 C.F.R. §405.1131; physical environment, 42 C.F.R. §405.1134; and infection control, 42 C.F.R. §405.1135.

Two federal surveyors testified on behalf of the Department in support of the Department's allegation that Brownsville had committed serious violations of the laws relating to medical assistance and medicare reimbursement. The surveyors testified from their report which led to the cancellation of Brownsville's provider agreement. Regarding governing body and management at Brownsville, the federal surveyors testified that the physician was not being notified in the event of an accident involving a patient or other significant change in the patient's physical, mental or emotional status. The federal survey team observed from nursing notes delays or omissions in notification of the attending physician. The team gleaned the following example from patients' records. One patient had worsening left foot pain from April 20-25, 1984, as a result of decreased circulation and gangrenous changes. No physician was contacted

during this time period. The physician visited the facility on April 26, 1984, and the patient was referred to the hospital for laboratory tests on April 27, 1984. The hospital then called the facility to notify it of the patient's admission.

Also with regard to governing body and management, the federal survey team found that patients' rights were being neglected; that the nursing staff was not ensuring that all patients were being treated with dignity, consideration, and respect concerning their personal privacy and cited as examples the staff's failure to draw privacy curtains around patients who were unclothed, patients improperly clothed, and patients using bed pans in full view of staff and visitors.

With regard to nursing services, the second condition of participation Brownsville did not meet at the time of the federal survey, the federal survey team found that the Director of Nursing failed to fulfill her duties and responsibilities, and that there were serious omissions on the part of the Brownsville nursing staff with regard to twenty-four hour nursing service. Examples cited included the patient with gangrene, another patient whose symptoms, indicating a limited oxygen supply, were communicated to the physician only upon the request of the surveyors, and another patient who, because of extensive decubitus ulcers, required an eggcrate mattress but who still had not received the mattress six days after the notation to obtain the special mattress had been entered in the patient's medical record. Further omissions in nursing services noted by the federal surveyors included failure to notify the physician of a patient's fall resulting in a fracture and bruises, failure to notify the physician of the discovery of signs of bleeding upon removal of a catheter, and failure to timely notify the physician of a patient's rapid deterioration apparent from monitoring the patient's vital signs.

Also under nursing services, the federal survey team found that the requisite patient care plans which are to indicate the care to be given patients and goals to be accomplished and the professional service responsible for each element of care did not adequately address patients' basic and rehabilitative needs. Several examples were noted: the nursing staff had not anticipated the needs of a readmitted patient recently hospitalized because of dehydration; physical therapy patients had no care plans for the service being rendered; and nurses aides, upon questioning, did not realize that a patient's care plan called for repositioning the patient every two hours.

The federal survey team also found Brownsville deficient with regard to rehabilitative nursing stating in its report that there was no evidence that restorative and rehabilitative measures were instituted on a consistent basis to meet patients' needs with respect to achieving and maintaining optimal self care and independence. In their report, the team noted their observations of patients seated in their rooms or in the lobby for extended periods of time and of the lack of progress and documentation regarding bowel and bladder retraining.

Finally, under the nursing services category, the federal survey team found Brownsville deficient in the area of supervision of patient nutrition. Under the federal regulations, nursing personnel in skilled nursing facilities are required to be aware of the nutritional needs and food and fluid intake of patients and assist promptly where necessary in the feeding of patients. Food and fluid intake is to be observed and deviations from normal are to be recorded and reported to the charge nurse and the physician. The survey team observed patients waiting to be fed because there were insufficient aides to assist all the patients requiring assistance. The team also noted that a patient with extensive decubitus ulcers

was receiving insufficient fluids and that documentation regarding fluid intake and output was missing from other patients' records.

Under dietetic services, the third condition of participation not met, the team found deficiencies with regard to staffing, preparation and service of food, and sanitary conditions. Like the state surveyors, the federal surveyors found that the design, construction, and upkeep of the facility's basement food service area was not consistent with acceptable standards of dietary sanitation, citing essentially the same problems cited by the state surveyors.

The fourth condition of participation not met, social services, requires that the skilled nursing facility have satisfactory arrangements for identifying the medically related social and emotional need of patients. The federal survey team found Brownsville deficient in ensuring that patients requiring social services received those services and in maintaining, in the patient's medical record, social data about personal and family problems medically related to the patient's illness and care.

The fifth condition of participation not met, patient activities, requires the skilled nursing facility to provide for an activities program, appropriate to the needs and interests of each patient, to encourage self-care, resumption of normal activities, and maintenance of an optimal level of psychosocial functioning. Like the state surveyors, the federal surveyors observed the absence of one-to-one activities for patients.

The federal surveyors concluded that Brownsville did not meet the sixth condition of participation, physical environment, based on their observation that Brownsville failed to maintain its buildings, equipment and facilities in an acceptable state of repair and cleanliness. Like the state surveyors, the federal surveyors

noted flaking paint, cracked walls, warped and buckled floor tiles, dirty, grimy surfaces, stained tubs and sinks, heavily soiled window screens, bathroom windows that could not be opened, and the above-mentioned deplorable state of the kitchen facilities. The surveyors included in their list of deficiencies under physical environment the inadequacy of Brownsville's preventive maintenance program, noting that observation of the facility's physical plant and equipment established that, if indeed the program was being implemented, it was ineffective in meeting the needs of the facility.

The seventh and final condition of participation not met was infection control. The standards established by this condition of participation require, like the state regulations, formation of an infection control committee charged with responsibility for establishing policies and procedures for investigating, controlling, and preventing infections in the facility. The team made a list of seven unacceptable environmental conditions observed in the basement supply room. Also, the team noted there was no written procedure for routine sterilization of bedpans and urinals, nor were patients' water pitchers individually labelled. The team found Brownsville deficient with regard to housekeeping, a sub-category under infection control which requires that the facility employ sufficient housekeeping personnel and supply necessary equipment to maintain a safe, clean, and orderly interior. The housekeeping staff lacked specific assignments for each tour of duty and no procedure had been implemented to monitor the housekeeping staff's performance. Finally, the federal survey team made the same observations as did the state survey team with regard to the availability of an adequate supply of linen to meet patients' needs, and Brownsville's methods of handling, storing, processing, and transporting soiled linens.

## VII.   Brownsville's Evidence

Brownsville's rebuttal evidence submitted at the hearing consisted of testimony to the effect that the deficiencies noted by the state and federal survey team had been corrected,[6] thereby admitting the deficiencies' existence. Thus, Paul Brilla, head of maintenance, and Jeanne Shepard, Director of Nursing, offered the following testimony: that in-service programs on handwashing, on in-dwelling catheter care and dressings, and on documentation and charting were held in July; that additional effort was being made to enhance Brownsville's program of personal care; that the laundry facilities had been painted and new laundry carts ordered; that the housekeeping, dietary, and nursing policies and procedures had been revised; that the sink without hot water had been repaired, as had the bedside stand and the leak from the roof to the first floor; that specific areas noted by the surveyors as being especially dirty had been cleaned; that locks had been installed on the janitor's closet; and that additional employees had been hired to accomplish more one-to-one patient activities and to perform restorative nursing procedures.

Jeanne Shepard also offered the following testimony. She testified that she was aware of Department regulations governing skilled nursing facilities, and that she had developed nursing services objectives for her nursing staff consisting of two licensed practical nurses and four registered nurses. Ms. Shepard described the procedure for decubitus care and explained that some

---

[6] The Department, pursuant to Section 814 of the Act, 35 P.S. §448.814, sent written notice of the deficiencies found with regard to the state regulations to Brownsville, and Brownsville, as required by the Act, submitted a plan of correction which was received by the Department on July 16, 1984. The plan of correction submitted by Brownsville admitted almost every deficiency noted by the Department.

patients were successfully treated while some were not. She explained that she had instructed her staff to release and reposition patients in restraints every two hours. On cross-examination, she admitted she could not be sure that her staff followed those instructions or that the staff was charting fluid intake as required. She testified that accomplishing increased fluid intake was difficult, referencing the dehydrated patient. Ms. Shepard testified that the facility's physician was promptly notified of changes in patients' conditions, and, at the same time, testified there had been no need to notify the physician of the patient's worsening foot pain because of gangrenous changes since the physician was well aware of the patient's condition and of the inevitability of surgery. Ms. Shepard admitted that certain patients' hair and nails sometimes appeared unkempt, stating that patients could be belligerent and uncooperative, and admitted that the clean linen supply was low at times, that she had seen stained and torn linen and had instructed that those linens be discarded. Finally she testified that patients at Brownsville do not wear stained or torn clothing for any significant period of time, and that her staff rendered adequate professional care and that every patient was treated with respect.

We must also consider the *relevant* testimony of Dr. DiLeo, Brownsville's medical director at the time of the survey, subpoenaed to testify by the department, despite the Department's assertions to the contrary.[7] Dr.

---

[7] The Department argued that it should have been entitled either to cross-examine or impeach Dr. DiLeo whom the Department subpoenaed to testify. Although the Judicial Code, at 42 Pa. C. S. §5935, permits a party to compel a person whose interest is adverse to the party calling him to testify as if under cross-examination, an employee of a party is ordinarily neither an adverse party nor sufficiently adversely interested so as to entitle the other party to call the employee as on cross-examination. Also, before counsel

DiLeo testified that he was unsure whether a procedure had been instituted at Brownsville to insure that a physician was always available, that routine or standing orders, instead of individualized orders, did not pose a threat to patients, that the procedure for decubitus care was medically sound, and that Brownsville had adequate staff and equipment to render appropriate care to patients.

The balance of Brownsville's evidence consisted of testimony from a resident, and three relatives of residents of Brownsville. John Praisner, a resident, testified that his own personal care was adequate; that he was treated with courtesy and respect; that he never knew bed linen to be in short supply; that nurses' aides changed soiled linens as soon as they were able; that meals were good; and that the facility itself was kept clean and in good repair. Ray Rose testified that his mother was provided with good medical and personal care; and that, while he had never eaten the food at Brownsville, he believed it was palatable since his mother never objected to it. Robert Alm testified that it was true that the outside of Brownsville was dirty, but that, from his observations on his monthly visits, his aunt received excellent care at Brownsville.

---

may attempt to impeach his own witness, he must establish that the testimony given by his witness was unexpected, *Commonwealth v. Waller,* 498 Pa. 33, 444 A.2d 653 (1982), and if counsel has never inquired of the witness how he would testify, counsel may not claim surprise. Dr. DiLeo's testimony was irrelevant, for the most part, however, as it concerned the results of the Department's monitoring visit conducted at Brownsville September 21, 1984, approximately three months after the surveys. Like the efforts made by Brownsville to cure the deficiencies in July, any additional deficiencies found at Brownsville, and the explanations or defenses therefor, subsequent to the surveys, are irrelevant for the purpose of determining Brownsville's compliance with Departmental rules and regulations for licensure in June, 1984.

## VIII. BOARD FINDINGS

After hearing the above testimony, the Board found the following facts:

30. The services of a physician were available to Brownsville patients at all times.

\* \* \*

33. Brownsville is adequately equipped to render good care to its patients.

34. Brownsville is maintained in a sanitary condition.

35. Patients at Brownsville receive adequate medical and nursing care.

36. All patients receive adequate nail and hair care, and male patients are shaved on a daily basis.

37. Patients at Brownsville are provided with an adequate supply of clean and sanitized clothing and bed linens.

38. Patients at Brownsville are dealt with courteously by all members of the staff.

39. Patients at Brownsville who suffer from decubitus ulcers are individually treated in accordance with accepted protocol.

40. No patient at Brownsville has died or suffered from a significant health problem as a result of any lack of professional care or violation of the rules and regulations of the Department.

41. Medical records at Brownsville are maintained in accordance with accepted professional standards and practices.

42. Brownsville has a program of patient care, supervised by the Director of Nursing and implemented by the nursing staff, which affords the patients good care, respect and dignity.

43. Mrs. Shepard is familiar with the rules and regulations of the Department relating to

nursing homes, and also with the professional standards by which a nurse must render nursing care.

44. Mrs. Shepard has established a nursing policy and procedural manual, and has prepared written job descriptions for each level of nursing personnel.

45. Mrs. Shepard has insisted that each nurse follow standards of nursing practice.

46. Mrs. Shepard has developed requisite nursing services objectives, including a program outlining the care of nursing home patients.

47. All patients at Brownsville have received good nursing care, before and during the time that Mrs. Shepard has been the Director of Nursing.

\*     \*     \*

49. Brownsville's policy is to notify the doctor when there is a significant change in a patient's condition, or when the patient complains of a significant problem. If the physician cannot be reached, there are written instructions available at the nursing stations indicating that an ambulance is to be called to transport the patient to the hospital.

50. The maintenance department at Brownsville has an established procedure for repairs of everything in the facility. This involves a regular inspection of items, including handrails, walls, nightstands, night lights, and the like. If anything breaks, nurses or aides fill out a repair slip and it is either replaced or repaired promptly.

\*     \*     \*

55. The floors and walls at Brownsville are clean and well maintained.

56. The entrance way to Brownsville, and the building's exterior are well maintained and free from excessive stains.

57. Brownsville provides excellent personal hygiene care to the residents, shaving male patients who cannot shave themselves, and seeing to it that those who can shave themselves do. It also provides good hair and nail care to all patients.

58. The staff of Brownsville is prompt about incontinence problems, and patients are supplied with clean, stain-free bedclothing.

59. The food supplied to the patients at Brownsville is nourishing and palatable, and special foods are provided when available.

60. The plates, cups and silverware provided to the patients at Brownsville is [sic] clean and generally unstained.

61. Patients at Brownsville receive good medical care.

62. Patients at Brownsville are not bothered by bugs or flies, and the windows are fitted with window screens.

63. The residents of Brownsville are provided with sufficient activities to keep them busy, such as community sings, bingo games and reading materials. They are supplied with large print bingo cards and books, if necessary.

*    *    *

## IX. CONCLUSION

After reviewing all of the evidence in this case, including the testimony of witnesses for both parties, we conclude, initially, that the Board failed to make necessary findings essential to the ultimate conclusion in this case and, second, that the findings that the Board did

make are unsupported by substantial evidence. The Board's findings do no resolve the issues raised by the evidence; *i.e.* whether Brownsville met the Department's very specific ownership and management standards, physical plant and equipment standards, housekeeping and maintenance standards, and infection control, dietary and medical services standards. The Department offered very specific examples of observations of violations of the above standards and the Board did not address the standards and alleged violations except in a very general way. Also, our examination of the record and the evidence submitted by Brownsville, including any and all inferences that might be derived therefrom, compels the conclusion that no reasonable man, acting reasonably, could have reached the conclusion that the Board reached in this case.

Support for the Board's findings is found only in the far from comprehensive testimony of a resident and two relatives of residents of Brownsville and in the testimony of Paul Brilla and Jeanne Shepard the major portion of which concerned efforts made by them and others at Brownsville to correct deficiencies found by the state and federal surveyors. The latter testimony is not competent, in our view, to rebut the Department's allegations of the existence of deficiencies in June 1984 serious enough to warrant immediate revocation of Brownsville's license to operate a skilled nursing facility. If that portion of Brownsville's testimony regarding efforts made to correct deficiencies is ignored, the Department's evidence remains largely unrebutted. Our conclusion that Brownsville's license must be revoked is reinforced by the Board's statement at the end of the discussion portion of its adjudication that it did "not mean to imply that Brownsville was in substantial compliance with state and federal law during the time in question." The Board went on to state that "had the Department

followed the recommendation of its examiners and issued a provisional license to Brownsville, we would have no difficulty in affirming such a decision." A decision by the Department to proceed under one or more of the remedies available to it is not subject to review by the Board. Section 805(d) of the Act, 35 P.S. §448.805(d).

We hold that the Board's conclusion that the Department did not meet its burden of proving serious violations of the Act or the regulations applicable to licensure, and that the Department did not meet its burden of proving a serious violation of the laws relating to medical assistance or medicare reimbursement is unsupported by substantial evidence.[8] Accordingly, we will vacate the Board's order and, in this case, direct the Board to enter an order revoking Brownsville's license.

We do so only upon close scrutiny of Sections 811 and 814 of the Act. 35 P.S. §§448.811 and 448.814. As we have stated, Section 811 provides the Department with authority to revoke a health care provider's license in the event of a *serious* violation of the provisions of the Act or attendant regulation, or of a *serious* violation of the laws relating to medical assistance or medicare. Section 811(1) defines a serious violation as "one which poses a significant threat to the health of patients." Section 814, however, mandates that the health care pro-

---

[8] The Department's order may not be upheld based on Section 811(3) of the Act, 35 P.S. §448.811(3), authorizing license revocation because of a cyclical pattern of deficiencies over a period of two or more years. The Department issued a six month regular license to Brownsville on February 29, 1984, thereby warranting the capacity of the facility to provide safe and efficient services, adequate for the care, treatment and comfort of patients. Section 808 of the Act, 35 P.S. §448.808. In doing so, the Department conceded the absence of a cyclical pattern of deficiencies since a finding of a cyclical pattern of deficiencies would preclude the Department from issuing even a provisional license.

vider, upon receipt of notice of a violation or violations of the Act or attendant regulations, "submit a plan of correction which shall bring the health care facility into compliance with applicable law or regulation within a specified time."

Because statutes must be construed to give effect to all their provisions, if possible, Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa. C. S. §1921(a), we initially believed a remand necessary to afford the Department opportunity to consider Brownsville's plan of correction and its success in the implementation of that plan. We have considered at length Sections 811 and 814 of the Act, however, and conclude that the Department may revoke a health care facility's license without first considering any plan of correction submitted by the facility, if the Department determines that the violation or violations found are so serious as to pose a significant threat to the health of the patients residing at the facility. We find that the evidence submitted by the Department constitutes proof of health-threatening conditions at Brownsville in June, 1984, justifying an immediate order revoking Brownsville's license, and, for that reason, we will direct the Board to issue an order revoking Brownsville's license to operate a skilled nursing facility.[9]

---

[9] Because we have decided to vacate the Board's order, we need not decide the remaining issues raised by the Department on appeal. In passing, however, we note that opinion testimony of a qualified expert has always been admissible, and opinion testimony by a lay witness regarding the ultimate issue is no longer inadmissible. *Lewis v. Mellor*, 259 Pa. Superior Ct. 509, 393 A.2d 941 (1978). Moreover, administrative agencies are not bound by technical rules of evidence at agency hearings; if evidence is relevant to issues before the agency and of reasonable probative value, the agency may receive it. *Murphy v. Department of Public Welfare*, 85 Pa. Commonwealth Ct. 23, 480 A.2d 382 (1984). It is well-established that the duty of the factfinder in an administrative hearing is to assure a fully developed record which will facilitate appellate review.

ORDER

And Now, this 4th day of February, 1987, the order of the State Health Facility Hearing Board in the above-captioned matter is hereby vacated, and this matter is remanded to the State Health Facility Hearing Board which is directed to enter an order revoking the license issued Respondent to operate a skilled nursing facility.