**MANORCARE HEALTH SERVICES–LANSDALE, Petitioner**

v.

**PENNSYLVANIA DEPARTMENT OF HEALTH, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs June 11, 2004.

Decided July 28, 2004.

Robert B. Hoffman, Harrisburg, for petitioner.

Robert A. Evarts, Harrisburg, for respondent.

BEFORE: COLINS, President Judge, SMITH–RIBNER, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Senior Judge McCLOSKEY.

Manorcare Health Services–Lansdale (hereafter Manorcare) petitions for review of an order of the Health Policy Board (Board), affirming in part and reversing in part an order of the Pennsylvania Department of Health (the Department), assessing a civil monetary penalty against Manorcare in the amount of $1,750.00 and issuing it a Provisional I license for the period from November 15, 2001, to May 15, 2002. We now affirm.

The underlying facts of this case are not in dispute. Manorcare is a long-term care facility licensed by the Department. One of Manorcare's patients was an 81 year old man (hereafter referred to as Resident 1) who had suffered several strokes as a result of atherosclerotic vascular disease and who had a history of coronary artery disease, abdominal aortic aneurysm, renal insufficiency, hypertension and depression. Primarily as a result of one or more strokes, Resident 1 suffered from right-sided paralysis and he could not ambulate without assistance, thus necessitating his presence at Manorcare's facility.[1]

In October of 2001, the staff at Manorcare noted that Resident 1 had a lesion on his chest. The staff immediately informed Resident 1's attending physician, Dr. Gary Gladstone. Dr. Gladstone initially ordered hot compresses. However, the lesion did not respond to this course of treatment. The staff so notified Dr. Gladstone, who then ordered a surgical consultation. Resident 1 thereafter was referred to Dr. Michelle Bertsch, a surgeon. Dr. Bertsch saw Resident 1 in the morning of November 12, 2001, wherein she was provided with Resident 1's medical paperwork, including a list of his medications. At the time, Resident 1 was taking Plavix, a blood thinning medication.

Following an examination of Resident 1, Dr. Bertsch decided to proceed with surgery in the nature of an incision and draining, often referred to as an "I & D." There is no dispute that the I & D was the appropriate treatment for the lesion once it failed to respond to more conservative treatment and that Resident 1 risked becoming septic had the lesion not been removed. The I & D procedure involves numbing the skin surrounding the lesion,

---

1. Nevertheless, Resident 1 was mentally alert and the staff at Manorcare considered him reliable in terms of his ability to accurately articulate his needs and wants.

using a scalpel to open the lesion and drain its contents. The surgeon then places a sterile packing in the incision and sutures the skin until it is almost closed. Following the I & D procedure, Dr. Bertsch provided aftercare instructions directing that the packing in the incision be removed three days post-surgery, on November 15, and thereafter replaced daily with a dry dressing.[2]

Resident 1 returned to Manorcare at approximately 12:30 p.m. Upon his return, he was greeted by Licensed Practical Nurse (LPN) Cassandra Brooks, who was the charge nurse on Resident 1's floor. After examining the dressing, Nurse Brooks proceeded to take Resident 1 to the dining room for lunch. Nurse Brooks next observed Resident 1 in his room at approximately 2:00 p.m. as she was talking to another person in the room, Certified Nursing Assistant (CNA) Michele Smith. Nurse Brooks did not observe any problems with Resident 1 at that time, nor was she alerted to any problem by Resident 1. Nurse Brooks did not check Resident 1's dressing at this time. Nurse Brooks returned to the room for rounds at approximately 3:00 p.m. with a trainee, LPN Peggy Ward. Again, she did not check Resident 1's dressing.[3]

Finally, at approximately 5:30 p.m., another CNA entered Resident 1's room with dinner, at which time she observed blood on the sheet covering him. The CNA immediately called for help and Nurse Brooks responded. Nurse Brooks removed the sheet and observed that Resident 1's shirt was covered with blood.[4] Nurse Brooks opened the shirt and applied pressure to the bandaged area. She then instructed the CAN who discovered the bleeding to retrieve Nurse Ward and another nurse from the dining area. Shortly thereafter, Nurse Brooks paged Manorcare's Director of Nursing and called 9–1–1 to arrange emergency transportation to a nearby hospital. Unfortunately, Resident 1 died at the hospital the next day.

The Department immediately initiated an investigation of the incident. The investigation was completed on November 15, 2001, finding numerous violations of Department regulations. The Department reviewed the findings as well as the licensure history of Manorcare, including its previous violations. The Department thereafter issued an order dated December 26, 2001, rescinding Manorcare's regular license and issuing it a Provisional I license for the period from November 15, 2001, to May 15, 2002. Additionally, the Department imposed a civil penalty against Manorcare in the amount of $1,750.00, representing a fine of $250.00 for each of seven found regulatory violations.[5]

Manorcare then filed an appeal with the Board and a hearing was held on December 10, 2002. At the hearing, three em-

---

2. These instructions were noted on Resident 1's appropriate charts upon his return to Manorcare.

3. Another CNA, Ledura Jerome, observed and interacted with Resident 1 at both 4:00 and 4:30 p.m., and she was not aware of any problems. Additionally, Nurse Ward returned to Resident 1's room at approximately 4:30 p.m. to administer medication to Resident 1's roommate, but she did not converse with Resident 1 at this time nor did she inspect his dressing.

4. When asked by Nurse Brooks if he knew that he was bleeding, Resident 1 responded in the affirmative. Nurse Brooks then asked Resident 1 if he had called for help and he responded in the negative.

5. These regulatory violations related to quality of care, administration, responsibility of licensee, nursing services and facility management.

ployees testified on behalf of the Department, Nancy Weiner, R.N., Diane Snyder, R.N. and Susan Getgen, Director of the Department's Division of Nursing Care Facilities. Nurse Weiner and Nurse Snyder are health facility quality examiners under Ms. Getgen's Division and are registered nurses since 1964 and 1965, respectively. Nurse Weiner and Nurse Snyder conducted the Department's initial investigation into the incident.

In her testimony, Nurse Weiner opined that the appropriate standard of nursing care was not met in this case as there was no examination of Resident 1's dressing by a licensed nurse between 12:15 p.m. and 5:30 p.m. on November 12, 2001. Nurse Weiner opined that she would expect, based on Resident 1's medical history, that the wound would be examined at least every one to two hours post surgery. On cross-examination, Nurse Weiner acknowledged that she had no way of knowing whether or not there would have been any evidence of bleeding even if the wound was checked one-half hour prior to the actual discovery of the bleeding.

Nurse Snyder reiterated the opinion set forth by Nurse Weiner, i.e., the appropriate standard of nursing care was not met in this case as there was no evidence that a licensed nurse assessed the wound or checked for complications on a frequent basis, including bleeding, swelling or discoloration. Nurse Snyder stressed that Resident 1 was on Plavix and therefore he had an increased chance of bleeding.

Nurse Snyder also noted that Resident 1 had experienced bloody drainage from the area prior to the I & D procedure.[6]

On cross-examination, Nurse Snyder acknowledged that she never consulted a physician, even Dr. Bertsch who performed the I & D procedure, in the course of the investigation of the incident. Nurse Snyder further indicated on cross-examination that she would have a professional disagreement with a physician who would indicate that there was no point in monitoring the vital signs of a resident following this type of surgery.[7]

In support of its appeal, Manorcare presented the deposition testimony of Nurse Brooks. Despite his physical limitations, Nurse Brooks described Resident 1 as mentally alert and oriented and capable of communicating his wants and needs. Upon his return from the I & D procedure, Nurse Brooks greeted Resident 1, examined his dressing and took him to the dining room for lunch. Nurse Brooks noted in Resident 1's progress notes that he had gone to the surgeon and the aftercare instructions provided by Dr. Bertsch.

Nurse Brooks next observed Resident 1 at 2:00 p.m. as she was walking into his room and talking to a CNA, although she could not recall speaking to him and she did not examine the dressing. Nurse Brooks returned to the room for rounds with Nurse Ward at 3:00 p.m. She stood next to Resident 1's bed and observed no bleeding. However, again, she did not pull back his sheet and examine the dressing.

---

**6.** Nurse Snyder further testified to the lack of notation of the lesion on Resident 1's care plan, the lack of a check of baseline vitals and the lack of a policy or procedure for checking post-operative wounds.

**7.** Ms. Getgen also testified on behalf of the Department. However, her testimony primarily focused upon the Department's procedure with respect to an investigation such as the one that occurred in this case. Ms. Getgen did briefly testify as to the regulatory violations found by the Department against Manorcare. On cross-examination, Ms. Getgen acknowledged that the Department did not seek out any expert medical opinion in this matter. However, Ms. Getgen indicated that there was never a medical problem requiring such expert opinion.

Manorcare also presented the deposition testimony of Nurse Ward. Nurse Ward first saw Resident 1 while conducting rounds with Nurse Brooks at 3:00 p.m. on November 12, 2001. Nurse Ward did not examine Resident 1 at this time. Nurse Ward returned to the room at 4:30 p.m. to administer medicine to Resident 1's roommate. She was present in the room for approximately three minutes. She did not examine Resident 1's dressing at this time.

Next, Manorcare presented the deposition testimony of CNA Jerome. CNA Jerome first saw Resident 1 at 4:00 p.m. on November 12, 2001. She exchanged greetings with him at that time and did not observe any blood on his sheets. She next saw him at 4:30 p.m. when she asked him if he needed to be changed and he indicated he was okay. CNA Jerome indicated that Resident 1 was reading a book at the times she was in the room.

Finally, in further support of its appeal, Manorcare presented the deposition testimony of Dr. Mary Maloney. Dr. Maloney has been a dermatologic surgeon for approximately twenty years and is a professor of medicine. Additionally, Dr. Maloney is Clinical Chief of Dermatology and Director of Dermatologic Surgery at the University of Massachusetts. She has performed numerous I & D procedures over the course of her career. Dr. Maloney testified that she would not have ordered that vital signs of a patient be checked after performance of such a procedure. Normally, Dr. Maloney indicated that patients are sent home following this minor procedure where vital signs are not monitored.

Dr. Maloney explained that this type of procedure does involve a small risk of post-surgical bleeding and that the patient is informed of the risk and what to do should bleeding occur. Dr. Maloney indicated her belief that Resident 1's bleeding was slow and continuous and could not have been observed for any significant period of time prior to the actual discovery of the bleeding by the CNA. On cross-examination, Dr. Maloney acknowledged that she was unaware what type of facility Manorcare was or what level of care Resident 1 was receiving, but indicated that she would not expect any increased care for a patient in a nursing home following an I & D procedure.

Following the hearing, the Board issued an adjudication and order dated December 10, 2003, affirming in part and reversing in part the Department's prior order. Specifically, the Board affirmed the Department's order with respect to the issuance of a Provisional I license to Manorcare. The Board also affirmed the Department's order with respect to six of the seven named regulatory violations and a civil penalty in the amount of $250.00 for each violation ($1,500.00 total). However, the Board reversed the Department's finding of a violation with respect to the regulation concerning facility management.

In rendering its decision, the Board noted that this case concerns the appropriate standard of care that is due to a resident of a long-term care nursing facility following a surgical procedure. The Board noted that such nursing care envisages more than simply following a physician's orders, it includes caring for a patient's general health and well being.[8] In other words, the Board indicated that the requirement that nurses follow the orders of physicians does not eliminate the need for another level of hands on care, especially in the context of a nursing care facility.

8. In this regard, the Board cited to the responsibilities of the registered nurse as found in the regulations adopted by the State Board of Nursing at 49 Pa.Code § 21.11.

The Board proceeded to describe the contacts between Resident 1 and Nurse Brooks, Nurse Ward and CNA Jerome following his surgery as insufficient to show that a proper assessment of Resident 1 was performed. The Board noted that the staff was fully aware that Resident 1 was taking Plavix. Despite the staff allegations that Resident 1 was mentally alert and capable of communicating his wants and needs, the Board noted that Resident 1's mental abilities were suspect since, as noted above, he informed Nurse Brooks that he was aware that he was bleeding but did not call for help. The Board further cited to the lack of any policy or procedure at Manorcare regarding post-surgical treatment and care as justification for its order. Manorcare thereafter filed a petition for review with this Court.

On appeal,[9] Manorcare argues that the Board erred as a matter of law in sanctioning it for not providing a resident with care that was medically unnecessary. We disagree.

Manorcare is a long-term care nursing facility. Section 802.1 of the Health Care Facilities Act (Act)[10] defines "long-term care nursing facility" as "a facility that provides either skilled or intermediate nursing care or both levels of care to two or more patients, who are unrelated to the licensee, for a period exceeding 24 hours." 35 P.S. § 448.802a. Section 2 of The Professional Nursing Law[11] defines the "practice of professional nursing" as "diagnosing and treating human responses to actual or potential health problems through such services as casefinding, health teaching, health counseling, and provision of care supportive to or restorative of life and well-being, and executing medical regimens as prescribed by a licensed physician or dentist." 63 P.S. § 212.

Section 805 of the Act addresses the role of the Board in licensure appeals, specifically providing the Board with the authority to hold evidentiary hearings and issue adjudications in accordance with the Administrative Agency Law, 2 Pa.C.S. §§ 501–508, 701–704, and the Board's own procedural rules. 35 P.S. § 448.805. The Board's procedural rules provide that the Department shall have the burden of proof in licensure appeals and that the parties to the proceeding shall have the right of presentation of evidence and cross-examination. See 37 Pa.Code § 197.90(a), (c).

In addition, we have previously addressed the role of the Board in licensure appeals, stating as follows:

> In licensure appeals ... the Board acts as a trial adjudicatory body; it hears all competent testimony, accepts relevant documentary evidence into the record, and, after hearing, weighs the evidence, makes findings of fact and conclusions of law according to the preponderance of the evidence and issues an order consistent with those findings and conclusions.

*Department of Health v. Brownsville Golden Age Nursing Home, Inc.,* 103 Pa. Cmwlth. 449, 520 A.2d 926, 930 (1987). In other words, the Board makes the credibil-

---

9. Our scope of review in agency appeals has been statutorily defined. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704, requires that we affirm the adjudication of a Commonwealth agency unless we find that it is not in accordance with law or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. *See Department of Health v. Brownsville Golden Age*

*Nursing Home Inc.,* 103 Pa.Cmwlth. 449, 520 A.2d 926 (1987).

10. Act of July 19, 1979, P.L. 130, *added by* Act of July 12, 1980, P.L. 655, *as amended,* 35 P.S. § 448.802a.

11. Act of May 22, 1951, P.L. 317, *as amended,* 63 P.S. § 212.

ity determinations on the evidence and testimony presented.

In this case, although the Board did not make any specific credibility determinations, it is evident from the Board's adjudication and order that it accepted the testimony of Nurse Weiner and Nurse Snyder as credible and persuasive and relied on such testimony in rendering its decision. As this testimony is detailed above, we need not recite it here. Suffice it to say, the credible testimony of Nurse Weiner and Nurse Snyder constitutes substantial, competent evidence in support of the Board's decision concluding that Resident 1 did not receive the appropriate standard of care that is due to a resident of a long-term care nursing facility following a surgical procedure.[12]

Accordingly, the order of the Board is affirmed.

### ORDER

AND NOW, this 28th day of July, 2004, the order of the Health Policy Board is hereby affirmed.

---

12. The undisputed facts of this case reflect that Resident 1 was admitted to Manorcare in August of 2000, that the nurses at Manorcare were aware that Resident 1 was taking Plavix and that he underwent a surgical procedure in the morning of November 12, 2001, albeit a procedure that is generally considered minor. Moreover, such facts reflect that with the exception of a quick check of Resident 1's dressing upon his return to the facility from the surgeon at approximately 12:30 p.m., no nurses checked said dressing from 12:30 p.m. until the bleeding was discovered at approximately 5:30 p.m., despite the fact that two nurses were present in Resident 1's room on several occasions during this five-hour period.