William L. TOMS, Petitioner,

v.

BUREAU OF PROFESSIONAL AND OCCUPATIONAL AFFAIRS, Respondent.

Commonwealth Court of Pennsylvania.

Argued April 9, 2002.
Decided June 10, 2002.

James J. Kutz, Harrisburg, for petitioner.

Thomas A. Blackburn, Harrisburg, for respondent.

BEFORE: FRIEDMAN, Judge, and COHN, Judge, and JULIANTE, Senior Judge.

OPINION BY Judge COHN.

This is an appeal from an order of the State Board of Funeral Directors (Board) in which a funeral director was fined and his license suspended because of his professional misconduct. The finding of professional misconduct was based on the funeral director's retrieving a decedent from a hospital and embalming the body without the written authorization of the next-of-kin, followed by his threatening to withhold the body from family members unless they paid his embalming fee. For the reasons set forth below, we affirm the Board's decision.

The case *sub judice* arises from the death of William Neeson, Sr. (Decedent) at Pocono Memorial Hospital during the early morning hours of January 18, 1999. On that same day, Decedent's son, William Neeson, Jr. (Neeson) contacted the James M. Hook Funeral Home to inquire about final arrangements for his father. Neeson spoke via telephone with the funeral home director for Hook, William L. Toms (Toms). During the conversation, Toms asked Neeson whether the family intended to have a viewing of Decedent. Neeson answered affirmatively. Toms and Neeson agreed to meet the following day at Hook Funeral Home in order to discuss and make final arrangements. Toms did not discuss with Neeson the Board regulations that required the embalming of a body within 24 hours of death if the body is to be viewed.[1] Additionally, Toms did not

---

1. The code provision reads:
   (6) Providing proper disposal of human remains in accordance with the following:

   (i) Human remains held 24 hours beyond death shall be embalmed or sealed in a container that will not allow fumes or odors

specifically ask Neeson if the family wanted Decedent to be embalmed. Shortly after the conclusion of their telephone conversation, Toms drove to the Pocono Medical Center, retrieved Decedent's body, transported it to Hook, and embalmed it.

At some point subsequent to his telephone conversation with Toms, Neeson telephoned a second funeral home to inquire about funeral arrangements and arranged to meet with this funeral director, Michael Bolock (Bolock). Later that same day, the two met and Neeson agreed to have Bolock handle the funeral arrangements for Decedent. Subsequently, Bolock traveled to Pocono Medical Center to retrieve Decedent's body and, upon arrival, learned that the body had already been taken by Toms. Bolock telephoned Neeson and told him what had happened.

Following his conversation with Mr. Bolock, Neeson telephoned Toms. During the conversation, Toms explained what he had done. Neeson informed Toms that the family had decided that Bolock would handle the funeral preparations. Upon learning of Neeson's decision, Toms conditioned transfer of the embalmed Decedent to Bo-

lock upon payment to Toms of $660 for the retrieval and embalming services already performed. Toms also informed Neeson that he previously worked for the Funeral Board and that he had friends on it, intimating that Neeson's only recourse to obtain Decedent's body was to pay the fee.

Following this conversation, Bolock called Toms. Toms reiterated his demand for payment before the body would be released. Later that afternoon, Bolock went to Hook Funeral Home, presented Toms with a check for the full amount requested, and retrieved Decedent's body. Shortly thereafter, the Neesons contacted the Board to lodge a complaint against Toms.

On April 14, 2000, the Board, acting in its prosecutorial capacity, initiated funeral license suspension proceedings against Toms by filing an Order to Show Cause. The Order contained two counts. In the first count, the Board alleged that Toms violated Section 11(a)(6) of the Funeral Director Law, Act of January 14–1952, P.L. (1951) 1898, *as amended,* 63 P.S. § 479.11(a)(6)[2] and Board regulation 13.202(11), 49 Pa.Code § 13.202(11)[3], by

---

to escape or kept under refrigeration, if this does not conflict with a religious belief or medical examination.

(ii) Human remains kept under refrigeration over 24 hours beyond the death shall be maintained at a temperature level between 35 and 40 F. The remains shall be buried, cremated or entombed within 5 hours following removal from refrigeration.

49 Pa.Code § 13.201(6).

**2.** The statutory provision reads:

(a) The board, by a majority vote thereof, may refuse to grant, refuse to renew, suspend or revoke a license of any applicant or licensee, whether originally granted under this act or under any prior act, for the following reasons:

\* \* \* \*

(5) Gross incompetency, negligence or misconduct in the carrying on of the profession.

(6) Violation of or non-compliance with the provisions of this act or the rules and regulations of the board.

**3.** This code provision reads:

Unprofessional conduct includes the following:

\* \* \* \*

(11) Furnishing embalming, other services or merchandise without having obtained written permission from a family member or other person authorized by law to make funeral arrangements for the deceased. Oral permission to embalm, followed by a confirmatory fax, telex, telegram, mailgram or other written confirmation will be acceptable.

retrieving Decedent's body for embalming without first obtaining written authorization from the next of kin. In the second count, the Board alleged that Toms violated Section 11(a)(5), 63 P.S. § 479.11(a)(5) [4] by refusing to release Decedent to the contracted funeral director until Toms was paid $660 for services performed. Toms filed a response *pro se.*

In his response, Toms acknowledges that he did not receive written permission to embalm Decedent. He also acknowledges that he did not specifically ask Neeson if the family wanted Decedent embalmed and that Neeson did not specifically state that the family wanted the Decedent embalmed. Instead, Toms argues that he received implicit authority from Neeson's oral statement that the family wanted a public viewing. In explaining this implicit authority, Toms references the regulations requiring embalming within 24 hours if there is to be a public viewing. He reasons that, regardless of which funeral home the Neesons would have selected for the viewing, the only way to effectuate the Neeson family's desire for a public viewing was to retrieve and embalm Decedent within that 24 hour span. Although Toms neither explained this regulation nor asked permission to embalm, Toms believed that he had told Neeson that he would do the "technical things" to effectuate the family's desire for a viewing. Additionally, Toms believed that Neeson did not respond to this statement and Toms interpreted this silence as agreement and acquiescence, which thereby imbued him with implicit authority to render the services he performed. Additionally, Toms argued that the inquiry he made with Neeson complied with Federal Trade Commission (FTC) guidelines. Toms did not reference any specific FTC provisions or materials in either his Response or during the hearing.

In contrast, Neeson testified that Toms did not say that he would do the "technical things." Additionally, Neeson claimed he specifically told Toms "that nothing was to be done until they spoke the next morning at 10:00."

On January 12, 2001, the Board issued an adjudication finding that Toms had violated both statutory provisions set out in the Order to Show Cause. Based on these violations, the Board suspended Toms's funeral license for a period of no less than two years and fined him a total of $2,000, $1,000 for each violation.

Regarding the first violation, the Board found that Toms violated Section(a)(6), which prohibits actions not in accordance with Board regulations, when he retrieved and embalmed Decedent without first obtaining written authorization. The Board's rationale was threefold. First, under the regulation that was violated, 13.202(11), 49 Pa.Code § 13.202(11), oral permission is not sufficient to embalm the body. The Board noted the exception that permits oral permission when followed by a written confirmation, but the exception was inapplicable because Toms did not obtain written confirmation. Second, the Board found that Toms did not receive oral permission to embalm. The Board noted that it "had the opportunity to observe Respondent's demeanor" and, based upon its observations, found that Toms "is not a credible witness." Accordingly, the Board "resolve[d] all conflicts in testimony" in favor of Neeson. (Adjudication at 7.) Since Toms's implicit authority argument derived from his purported statement, and since the Board determined that this statement was not made, the Board rejected his implicit authority argument.

4. *See* fn. 2.

Additionally, the FTC materials presented by the Commonwealth during the hearing specifically provided that "you must get **express** permission to embalm; it cannot be implied." (Adjudication at 10.)[5] The Board noted that even under Toms's version of the events, he did not receive express authority. Nonetheless, based on its credibility determinations, the Board foreclosed any finding of express permission by determining that Neeson had told Toms to take no action pending their meeting the next day. Third, the Board determined that Toms had not stated that he would do the technical preparations. Based on these findings, the Board found that "There is no factual basis for Respondent's argument." (Adjudication at 10.)

Regarding the second violation, the Board found Toms violated Section 11(a)(5), 63 P.S. § 479.11(a)(5), which prohibits general "misconduct," by refusing to release Decedent's remains without first receiving payment and also by suggesting his undue influence with the governing body. In response to the Board's order, Toms filed the instant appeal.

Toms frames two issues before the Court. First, he argues that critical findings of fact are not supported by the record evidence and, even if these findings are supported by the record, they do not support the conclusion that he engaged in unprofessional conduct. Second, Toms argues that Regulation 13.202(11) is unconstitutional because it imposes liability on a funeral director for conduct which, at the time it is engaged in, is lawful, but that subsequently becomes unlawful at the whim of a third party.

■ Our standard of review in evaluating the adjudication of a professional licensing board is narrow. We are constrained to affirm the decision unless the necessary findings of fact are not supported by substantial evidence in the record, there was a constitutional violation or an error of law. *Geisel v. Pennsylvania State Board of Funeral Directors,* 755 A.2d 750, 751 n. 2 (Pa.Cmwlth.2000).

We first address Toms's attack on the Board's imposition of a sanction for a purported violation of Section 11(a)(5), 63 P.S. § 479.11(a)(6). Under this provision, the Board is empowered to revoke a funeral director's license for failure to comply with its regulations. In evaluating the Board's interpretation of its own regulation:

[W]e are mindful that our courts have long recognized that the General Assembly has a legitimate interest in regulating the funeral industry to safeguard the interests of the public and the standards of the profession. Moreover, the General Assembly has empowered the Board to formulate necessary rules and regulations not inconsistent with the Law for

---

**5.** The FTC material referenced was a booklet promulgated by the Federal Trade Commission that explained federal regulations governing funeral service providers. Specifically, the booklet noted that Federal regulations require express approval for embalming:

You must get *express* permission to embalm; it cannot be implied.
**Example:** A family states that they want a viewing before burial and asks you to "prepare" the deceased. You must specifically ask the family for permission to embalm and must receive their permission before you embalm the body.

In order to obtain the family's express consent to embalm, you must: 1) specifically ask for and obtain their permission, and 2) not misrepresent when embalming is required.
. . .
The rule does not require you to get the permission in writing, as long as it is express approval. Some states, however, may require written authorization.
("Complying with the Funeral Rule Federal Trade Commission" Booklet, October 1999, at 28.)

the proper conduct of the business and profession of funeral directing. Thus, the Board must be given deference in the interpretation of its rules and regulations.

*Ferguson v. Pennsylvania State Board of Funeral Directors*, 768 A.2d 393, 397–98 (Pa.Cmwlth.2001) (citations omitted), *petition for allowance of appeal denied*, 566 Pa. 670, 782 A.2d 549 (2001).

■ The regulation at issue very clearly prohibits funeral directors from embalming a decedent and providing "other services" without first obtaining written permission. *See* 49 Pa.Code § 13.202(11) at fn. 3. Toms seeks to circumvent the writing requirement through means of the last sentence of subsection 11 of the regulation. Toms correctly notes that this last sentence does create a limited exception to this writing requirement when "[oral] permission to embalm [is] followed by a ... written confirmation...." 49 Pa.Code § 13.202(11). However, the Board's factual findings preclude application of the oral authorization exception because, in contra-

vention of the requirements of this exception, Neeson never provided Toms with oral authorization to perform these services. We are bound by the Board's credibility determinations and the facts derived therefrom.[6] From our review of the record, the Board's findings are supported by substantial evidence.

■ The primary premise of Toms's argument is that the Board can only sanction him for professional misconduct if it finds that he acted knowingly-that is, that he performed the services of retrieving and embalming Decedent's remains, despite knowing that he lacked authorization to do so. Toms argues that since the Board failed to make a finding that he acted knowingly, and since the record does not support such a finding, the Board incorrectly found that he committed professional misconduct.[7] Toms's argument falls short for several reasons. First, Toms provides no statutory or case law directly on point that requires the knowing, scienter requirement that he seeks to impose.[8]

---

**6.** *See Tandon v. State Board of Medicine*, 705 A.2d 1338, 1343 (Pa.Cmwlth.1997), *petition for allowance of appeal denied*, 556 Pa. 682, 727 A.2d 134 (1998) ("When reviewing a decision of [an administrative board], this court may not reweigh the evidence presented or judge the credibility of witnesses. Thus, as the ultimate finder of fact, the board may accept or reject the testimony of any witness in whole or in part, and this court is bound by the credibility determinations by the board.") (Citations omitted.)

**7.** In his brief before this Court, Toms focuses significant discussion on a letter he had sent to Neeson approximately one month after the incident, arguing that a review of the letter by this Court is critical. Toms argues that the Board incorrectly read the letter and, based on its reading, interpreted it as an admission that "Mr. Toms knew he did not have permission." (Toms's Brief at 14.) First, as discussed, Toms has established no basis for imposition of a knowing requirement. Second, Toms mischaracterizes the Board's use

of this letter. The Board did not use the letter as an admission of a "knowing violation." Rather, the Board used the letter in evaluating the credibility of the witnesses. Specifically, the Board cites a portion of the letter that read "on the day your father passed away you had mentioned in our conversation that it was your understanding that we were not going to do anything with your father until the following morning, in specific after 10:00 a.m." (Letter to Neeson from Toms, 2/25/99.) The Board referenced this portion of the letter in its discussion of the credibility of the witnesses, noting that the language of the letter supported Neeson's account of events and did not support Toms's account. We find no error in the Board's use of this letter to weigh credibility.

**8.** For support of his argument, Toms cites to various legal and general dictionaries as well as to a few cases involving interpretations by various Medical Boards, regarding what constitutes "unprofessional conduct" for physi-

Second, it completely ignores the Funeral Board's own definition of unprofessional conduct, which is defined, in detail, in the regulation at issue in this case. Third, it avoids the very clear facts that Toms was aware: that he had not specifically asked if he could retrieve the body; that he had not specifically asked if he could embalm the body; that Neeson had not expressly authorized either the retrieval or embalming services; that Toms had not informed Neeson of the urgency with which a decision needed to be made, given the stated family wishes for a viewing and the applicable 24 hour regulation; and that he did not have a written confirmation before he acted.

We have previously discussed the foundation for requiring permission to be memorialized in writing. In the case of *Hunt v. Pennsylvania Board of Funeral Directors*, 45 Pa.Cmwlth. 324, 405 A.2d 996 (1979), the Commonwealth Court affirmed the Funeral Board's sanctioning of a funeral director for embalming a decedent's remains without obtaining written authorization from the family.[9] In the opinion we noted:

> the Board maintains that the regulation requires the signature prior to embalming [because] the written agreement form was designed to eliminate confusion by assuring that every client is informed of and agrees to the rendering

of all services prior to their performance. Embalming, of course, is a necessary service, and the object of the regulations would clearly not be served if embalming were to be performed before a signed and written agreement were to be obtained. Awaiting such a signature may present problems because of the time demands of embalming a body within 24 hours of death, but we believe that the regulation requires the signature prior to embalming, and the Board's finding of a violation as to the requirement of the regulation will be affirmed.

*Hunt*, 405 A.2d at 999 (Pa.Cmwlth.1979) (footnotes omitted). The additional rationale we provided in *Hunt* is instructive for this case:

> While [the funeral director] may have honestly thought that the family had chosen him to handle the funeral arrangements ... he knew that [the family representative] had signed no consent.
>
> . . . .
>
> A signed written agreement form would obviously have served to protect him from any misunderstanding as to whom [the family representative] wanted to serve as the funeral director, and would further serve to prevent unauthorized actions.

cians. These cases are clearly distinguishable. Aside from the obvious fact that this case does not involve either a physician or a medical board, the argument completely ignores the very clear language of the Funeral Board regulation that specifically defines what constitutes "unprofessional conduct" for a funeral director. As noted, we grant significant deference to a Board's interpretation of its own provisions.

**9.** In *Hunt* we reviewed the Board's violation of, then, Regulation 13.184, 49 Pa.Code 13.184, which has since been recodified at 49 Pa.Code § 13.204. These provisions discuss

the requirements of the written agreement that must be executed between the family and the funeral director. The issue in *Hunt* dealt with what was meant in Regulation 13.184 by the requirement that the form be signed prior to disposition. The funeral director argued that disposition meant burial or cremation, whereas the Board argued it meant embalming. We accepted the Board's position and affirmed its sanction. Although the instant case involves a different code provision, the reasoning and policy behind the regulation are helpful in addressing the instant case.

*Hunt,* 405 A.2d at 999, n. 5. We adhere to these same principles here.

The Funeral Director Law and its applicable code provisions impose rules and restrictions on funeral directors not only to protect the bereaved while they are at their most vulnerable, but also to provide a framework with which to help the bereaved address each of the issues that arise when making final arrangements for a deceased loved one. Both state and federal regulations are clear that funeral directors may not perform services on a body without obtaining express permission. Toms makes no argument that he obtained express permission. By failing to obtain express permission, no matter how well intentioned, he violated the applicable regulations. We find no error in the Board's imposition of a sanction under Section 11 of the Funeral Director Law and Board Regulations.

█ We turn to Toms's arguments regarding the Board's imposition of sanctions under Section(a)(5) for Toms's purported misconduct in refusing to turn over Decedent's body absent payment for his services. Toms's argument is similar to his argument regarding Section 11(a)(6), in that he again references a scienter element that he claims was lacking. Specifically, he argues that

It is difficult to understand how this constitutes unprofessional or improper conduct. Notably at the time [Toms] was asked to turn the body over, Toms was of the firm belief that he *had* been empowered orally to do precisely that which he did; i.e., embalm the body.

Toms then references principles of unjust enrichment as a basis for keeping the body until he was paid.

In prior cases involving our review of Funeral Board decisions, we have defined the term "misconduct" to mean a breach of the generally accepted canons of ethics and propriety governing the respectful and reverential burial of the dead. *McKinley v. State Board of Funeral Directors,* 11 Pa.Commw. 241, 313 A.2d 180 (1973).

Geisel, 755 A.2d at 751, n. 1.

The Board, in evaluating the facts of the case at bar, wrote:

Respondent's misconduct is extremely serious. Embalming remains without authorization is simply wrong, and expecting to be paid for such unauthorized work is even worse. Holding remains hostage for payment for unauthorized services as ransom is vile and base. Moreover, Respondent asserted his prior position as a mortuary inspector for the Board to claim influence with this Board and to coerce Neeson into accepting and enduring this flagrant abuse. The public deserves to be protected from such dishonest and unethical principles.

Such strong language from the tribunal entrusted with enforcing the Funeral Director Law and possessing the expertise to do so is compelling. The Board determined that Toms had breached accepted canons of ethics. We find no error in the Board's application of the law and we reject Toms's arguments to the contrary.

█ We turn now to the constitutional question Toms raises, *i.e.,* that Regulation 13.202(11) is void for vagueness. Both parties agree that the applicable standard for analysis is that a statute or regulation is unconstitutionally vague where it either traps the innocent by failing to give a person of ordinary intelligence reasonable opportunity to know what is prohibited so that he may act accordingly, or results in arbitrary and discriminatory enforcement in the absence of explicit guidelines for its application. *Watkins v. State Board of Dentistry,* 740 A.2d 760 (Pa.Cmwlth.1999).

Toms argues that regulation 13.202(11) is unconstitutionally vague because it sets up a situation where a licensee faces disciplinary action based on "an unlicensed individual's [bereaved family member] unfettered discretion to unilaterally turn an otherwise lawful act of embalming into an unlawful act by withholding written confirmation." Additionally, Toms argues that the provision is vague because it provides no guidance to a funeral director as to what to do when a person gives explicit oral authorization but, subsequently, refuses to give written authorization.

The Board argues that constitutional analysis is not appropriate here because the facts of the case are different from the issue Toms seeks to place before the Court. Specifically, the Board argues that this is not a case where Toms initially received an oral authorization that was not subsequently followed by a written one. Rather, this is a case where Toms *never received authorization of any kind, oral or written*. Accordingly, the Board asserts the issue Toms argues is not appropriately before the Court. We agree.

The Board made the factual determination that Toms did not receive authority, written or oral, to embalm the body. Indeed, Toms's own position acknowledges no explicit written or oral authority, but relies on an implicit authority argument. This is not a case where oral authority was explicitly granted and subsequently revoked. As the Board states in its brief:

> Tom's [sic] argument that Neeson caused the violation by withholding written confirmation after giving oral permission is misleading, for no form of permission was ever given. Any mistake by Mr. Toms that oral permission had been given was unreasonable and in

bad faith. To the extent Mr. Toms believed that embalming was required within 24 hours after death, he should have told Mr. Neeson that he could not wait until after their meeting the next day to remove the remains. This matter provides no basis to conclude that the Board's regulation at 49 Pa.Code § 13.202(11) is unconstitutionally vague.

(Board's Brief at 11.) We find no error in the Board's discussion. Accordingly, we need not reach the constitutional issue.[10]

Based on the foregoing discussion, we affirm the Board's order.

### ORDER

**NOW,** June 10, 2002 the order of the State Board of Funeral Directors in the above-captioned matter is hereby AFFIRMED.

---

**10.** Toms has raised no issue as to the severity of the sanctions imposed; accordingly, any such argument is waived.