# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Celeste Learning Center, :
                    Petitioner :
                             :
                v. : No. 518 C.D. 2020
                             : Submitted: September 20, 2021
Department of Human Services, :
                    Respondent :

BEFORE: HONORABLE P. KEVIN BROBSON, President Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge (P.)
              HONORABLE J. ANDREW CROMPTON, Judge

*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY PRESIDENT JUDGE BROBSON               FILED: December 20, 2021

Celeste Mendez d/b/a Celeste Learning Center (Center) petitions for review of an order of the Chief Administrative Law Judge of the Department of Human Services (DHS), Bureau of Hearings and Appeals (BHA), dated May 7, 2020, which adopted the recommendation of an Administrative Law Judge (ALJ), thereby denying the Center's appeal. The ALJ concluded that DHS properly revoked the Center's first provisional certificate of compliance (provisional certificate) to operate a child care center based upon violations of the Human Services Code (Code)[1] and DHS's child care regulations. For the reasons that follow, we affirm.

---

[1] Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. §§ 101-1503.

## I. BACKGROUND

The Center is a child care center located in Allentown, Pennsylvania.[2] DHS conducted inspections at the Center in September 2018 and again on various occasions in November and December 2018. DHS cited the Center for several regulatory violations that included improperly staffed mixed-age levels (*i.e.*, not maintaining proper staff-to-child ratios) and improper supervision of children. As a result of the violations, DHS revoked the Center's regular certificate of compliance in February 2019 and issued a provisional certificate that was effective from January 18, 2019, to July 18, 2019. The Center did not appeal the decision.

DHS next conducted inspections at the Center on April 24, 2019, and May 2, 2019, and identified, in relevant part, violations for improperly staffed mixed-age levels, child and adult hygiene, and supervision of children. DHS issued a notice, revoking the Center's provisional certificate on June 21, 2019, for failure to comply with the Code and violating three DHS regulations;[3] failure to comply with the acceptable plan to correct noncompliance items; and gross incompetence, negligence, or misconduct in operating the facility.

---

[2] "Child care center" is defined as "any premises operated for profit in which child care is provided simultaneously for seven or more children who are not relatives of the operator, except such centers operated under social service auspices." Section 1001 of the Code, 62 P.S. § 1001.

[3] DHS cited a total of eight regulatory violations as a result of the inspections on April 24, 2019, and May 2, 2019. (Analysis and Conclusion (AC) at 10 n.3; Certified Record (C.R.) at 124.) Specifically, DHS cited the Center for (1) two violations relating to mixed-age levels; (2) two violations relating to rest equipment; (3) one violation relating to child hygiene; (4) one violation relating to adult hygiene; and (5) two violations relating to supervision of children. DHS, for purposes of showing the Center's history of repeated regulatory noncompliance, also referenced six regulatory violations that occurred after inspections in November 2018: (1) three violations relating to mixed-age levels; and (2) three violations relating to supervision of children. (AC at 10 n.2; C.R. at 124.) The ALJ excluded the November 2018 violations as a basis for DHS's revocation of the provisional certificate. (*Id.*)

The Center appealed DHS's revocation of its provisional certificate in July 2019, and the Center's attorney, in a letter accompanying the appeal, stated that the Center "fully understands the seriousness of the aforesaid violations and understands that DHS may revoke a license for a single regulatory violation." (C.R. at 13.) Further, the Center's attorney represented that the Center "is not denying the allegations but is, and has been, taking immediate steps to bring any problems into compliance." (*Id.*) The Center's attorney further noted that "in this case no harm came to any child."[4] (*Id.*)

The ALJ held a hearing in November 2019, and DHS's sole witness was Office of Child Development and Early Learning (OCDEL) Certification Representative Matthew Spencer. Mr. Spencer testified about his duties as a DHS Certification Representative and the types of inspections he conducts. Mr. Spencer also testified about the various Inspection Summary Reports (ISR) he prepared, setting forth the location of the Center, the regulations violated, a description of what he observed during the inspections, the corrections required, the Center's plan of correction, and a date for the Center to complete any corrections.[5] Mr. Spencer testified that Mrs. Mendez was present at the Center during the inspections on April 24, 2019, and May 2, 2019. Mr. Spencer then provided specific details concerning the three categories of violations relevant to this appeal.

First, concerning the mixed-age-level violations, Mr. Spencer testified that on May 2, 2019, he observed one of the Center's employees out of ratio by one child

---

[4] The ALJ admitted into evidence at the hearing a copy of the Center's attorney's appeal letter as DHS's Exhibit C-2. (C.R. at 78-80, 237, 253.)

[5] The ALJ admitted into evidence as DHS's Exhibit C-1, identified by DHS as a "Negative Sanction Notice and Attachments," which was issued to the Center and included Mr. Spencer's ISRs. (C.R. at 47-77, 210, 253.)

3

when she was supervising thirteen school-age children instead of the maximum permissible number of twelve where the youngest child in the group is six years old. Mr. Spencer testified that, on the same day, he observed a Center employee leave another Center employee alone in the younger toddler room with six children instead of the maximum permissible number of five when the youngest child in the group is one year old.

Second, concerning the child and adult hygiene violations, Mr. Spencer testified that DHS requires that the Center employees ensure that children's hands are washed before meals and snacks, after toileting, and after diapering. Mr. Spencer explained that the Center employees must also wash their own hands in the aforementioned situations. Mr. Spencer testified that on April 24, 2019, while he was in the Center's infant room, he observed a Center employee fail to wash her hands or the child's hands after she changed the child's diaper.

Third, concerning the supervision of children violation, Mr. Spencer testified that DHS requires children on the Center's premises to be supervised at all times. Mr. Spencer testified that, on May 2, 2019, he observed a school-age child alone in the Center's lobby for approximately one to two minutes, although he later clarified that he was not sure how long the child was alone in the lobby before he noticed the child. Mr. Spencer also described the physical layout of the Center, noting that there is a hallway separating the lobby from the classrooms and the exit from the Center is in the lobby.

Mr. Spencer testified that, after his inspection, the Center submitted acceptable plans of correction for each of the three violations. The Center's attorney, on cross-examination, asked Mr. Spencer about the Center's compliance concerning the three categories of violations, but DHS objected to the question based on

4

relevance. DHS's attorney explained that any corrective action after the date of the negative sanctions was irrelevant to the revocation proceedings, and the ALJ sustained the objection. The Center's attorney asked Mr. Spencer how long he remained in the infant room after observing the improper hygiene violation, and he testified that he remained for at least five to ten minutes. Mr. Spencer also testified that he could not recall if the Center's employee was wearing gloves during the diaper change, but, even if she was, DHS's regulations require that she still wash her hands. With regard to the child who was unsupervised in the lobby, Mr. Spencer testified that he and Mrs. Mendez spoke with the child's mother. Mr. Spencer testified on re-direct that he did not observe a Center employee specifically responsible for working in the lobby area.

The Center called Mrs. Mendez as its sole witness. Mrs. Mendez testified that the Center has a handwashing policy, that she trains her staff how to wash hands properly, and that there are instructions posted over the sink regarding handwashing. Mrs. Mendez also explained that her employees must wear gloves while working at the Center. Mrs. Mendez testified that she was at the Center when Mr. Spencer observed the child unattended in the lobby, and she explained that the lobby is small with a door leading to the street. Mrs. Mendez testified that the Center has a big parking lot for the parents to use when dropping off the children, but some parents just park out front and take their child inside to their child's teacher. Mrs. Mendez testified that you need to be "buzzed" to be let into the building and that her husband is in charge of letting people into the Center. Mrs. Mendez explained that the Center has a policy that requires the parent to bring a child into the building. Mrs. Mendez testified that you cannot see into the lobby from the Center's classrooms.

5

Mrs. Mendez, on cross-examination, admitted that DHS's regulations do not provide for the use of gloves instead of handwashing for her employees. Mrs. Mendez testified that the Center's handwashing policy was in effect at the time of the violations. When DHS's attorney pointed out that, in response to one of the violations, Mrs. Mendez said that the Center would implement a handwashing policy, she did not directly answer his question. Mrs. Mendez, on re-direct examination, testified that she had a handwashing policy in place at the Center prior to April 2019, and it was her plan to maintain a handwashing policy. The Center rested its case, and the ALJ adjourned the hearing. Both DHS and the Center submitted post-hearing briefs in January 2020.

The ALJ, based upon the evidence and testimony presented, recommended that the Center's appeal be denied based solely on its failure to comply with the Code and DHS's regulations.[6] (AC at 14; C.R. at 128.) The ALJ found that for the two mixed-age-level violations, Mr. Spencer "presented testimony consistent with the written violation and explained [that the] [Center's] rooms are physically separated by walls." (AC at 10; C.R. at 124.) Additionally, the ALJ found that the Center's employee "responsible for the young toddlers was the sole caregiver for

---

[6] While not issues in this appeal, we note that the ALJ also concluded that DHS did not prove that the Center failed to comply with acceptable plans to correct the noncompliance items and the gross incompetence, negligence, or misconduct in operating the facility claims. (AC at 13-14; C.R. at 127-28.) Specifically, the ALJ explained that at the hearing DHS objected to the relevancy of the Center's testimony regarding its compliance with the acceptable plans of correction. The ALJ sustained DHS's objection. DHS then failed to address the Center's compliance with accepted plans of correction and only generally contended that repeated violations of regulatory provisions constituted a failure to comply with an acceptable plan of correction. Similarly, DHS failed to identify anything more than simple noncompliance with the regulations and, again, only generally contended that repeated regulatory violations amounted to gross incompetence, negligence, or misconduct. The ALJ disagreed with DHS's contentions and dismissed both claims.

approximately five minutes." (*Id.*) The ALJ recognized that the Center "did not dispute the violation but contended that [DHS] accepted the [Center's] plan of correction which was implemented to correct the violation." (AC at 10-11; C.R. at 124-25.) The ALJ remarked that the Center's arguments did not mitigate the violation and, as a result, concluded that "[DHS] presented substantial evidence that [the Center] violated [DHS's mixed-age-level regulation]." (AC at 11; C.R. at 125.)

Next, concerning the hygiene violations, one child and one adult, the ALJ relied upon Mr. Spencer's testimony based on his personal observations on April 24, 2019. The ALJ found that the Center did not dispute that the employee did not wash her hands or the child's hands. (*Id.*) The ALJ referenced Mrs. Mendez's testimony about the Center's policy that required employees to wash their hands and the children's hands after diaper changes, that Center employees were trained to do so, and that Center employees must also wear gloves in this situation. (*Id.*) The ALJ concluded that strict compliance with the regulations is mandatory, substantial compliance is insufficient, and, despite the Center's policy and training, DHS presented substantial evidence that the Center violated the child and adult hygiene regulations. (AC at 11-12; C.R. at 125-26.)

Finally, regarding the Center's supervision of children violation that resulted from the child being alone in the lobby, the ALJ credited Mr. Spencer's testimony as supporting the cited violation. (AC at 12-13; C.R. at 126-27.) The ALJ explained that the Center "confirmed the incident and stated [that] the child entered the lobby without staff knowledge" while arguing that "an acceptable plan of correction was submitted and implemented to correct the violation." (AC at 13; C.R. at 127.) The ALJ concluded that the Center's argument failed to mitigate the violations and that

7

DHS presented substantial evidence that the Center violated the supervision of children regulation.[7] (*Id.*)

DHS's BHA Chief Administrative Law Judge adopted the ALJ's recommendation in its entirety by final administrative order dated May 7, 2020, and denied the Center's appeal of the revocation of its provisional certificate. This appeal followed.[8]

## II.  ISSUES

The Center essentially raises five issues on appeal.[9] First, the Center contends that the ALJ's findings of fact are not supported by substantial evidence. Second, the Center argues that the ALJ erred as a matter of law when he excluded evidence of the Center's substantial compliance with DHS's accepted plans of correction. Third, the Center contends that the ALJ erred as a matter of law when he excluded

---

[7] In addition, the ALJ concluded that DHS met its burden to prove that Mrs. Mendez violated a DHS regulation prohibiting inappropriate language based upon what Mrs. Mendez said to the child who was unsupervised in the lobby. (AC at 13; C.R. at 127.) Pursuant to 55 Pa. Code § 3270.113(d), "[a] facility person may not use harsh, demeaning or abusive language in the presence of children." Mr. Spencer testified that he heard Mrs. Mendez tell the child that he was responsible for the possibility of her license being revoked. Mrs. Mendez denied that she used "inappropriate language." The ALJ found Mr. Spencer's testimony to be more credible than Mrs. Mendez's testimony. We note that the ALJ did not, however, conclude that DHS met its burden to prove that the Center violated a regulation relating to rest equipment. (AC at 12; C.R. at 126.)

[8] We note that, in an unreported, single-judge opinion of this Court, the Honorable M. Hannah Leavitt granted the Center's application for supersedeas of DHS's May 7, 2020 order, revoking the Center's provisional certificate. *Celeste Learning Ctr. v. Dep't of Hum. Servs.* (Pa. Cmwlth., No. 518 C.D. 2020, filed April 6, 2021). In so doing, Judge Leavitt concluded that the Center "has, at the very least, presented a 'substantial case on the merits[,]'" that closure of the business satisfied the requirement of irreparable harm, that the stay would not harm other interested parties, and that issuance of the stay would not adversely affect the public interest. *Id.*, slip op. at 4-8 (quoting *Pa. Pub. Util. Comm'n v. Process Gas Consumers Grp.*, 467 A.2d 805, 809 (Pa. 1983)). Consequently, the Center has remained open pending the decision of this panel on the merits of its appeal.

[9] After reviewing the Center's arguments, we have reframed the issues and reordered them for purposes of convenience.

8

as hearsay Mrs. Mendez's testimony about what the mother of the child who was unsupervised in the lobby told her concerning why the child was in the lobby alone. Fourth, the Center argues that DHS is holding Mrs. Mendez to strict compliance with its regulations for the misconduct of her employees despite the training and the policies she has in place as the owner and operator. Finally, the Center contends that DHS's revocation of its provisional certificate was improper, because revocation is only appropriate when the violations are so serious that the children were threatened with harm.[10]

## III. DISCUSSION

The Code authorizes DHS to revoke a provisional certificate of compliance, in relevant part, for "[v]iolation of or non[]compliance with the provisions of [the Code] or of regulations pursuant thereto." Section 1026(b)(1) of the Code, 62 P.S. § 1026(b)(1). The law has been exceptionally clear for over three decades—*i.e.*, that DHS may revoke a license (*e.g.*, a provisional certificate) for even a single violation of its regulations. *Aa to Zz Childcare & Learning Ctr. v. Dep't of Hum. Servs.* (Pa. Cmwlth., No. 651 C.D. 2018, filed May 1, 2019), slip op. at 8[11] (citing *K.C. Equities v. Dep't of Pub. Welfare*, 95 A.3d 918, 930 (Pa. Cmwlth. 2014), *appeal denied*, 106 A.3d 727 (Pa. 2015); *Altagracia*, 943 A.2d at 356; *Pine Haven*

---

[10] Our review of a final order of DHS is limited to determining whether an error of law was committed, whether constitutional rights were violated, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704; *Altagracia De Pena Family Day Care v. Dep't of Pub. Welfare*, 943 A.2d 353, 356 n.3 (Pa. Cmwlth. 2007) (*Altagracia*).

[11] Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), provides that "an unreported panel decision of this Court issued after January 15, 2008," may be cited for its persuasive value.

9

*Residential Care Home v. Dep't of Pub. Welfare*, 512 A.2d 59, 61 (Pa. Cmwlth. 1986)).

## A. Substantial Evidence

The Center contends that DHS's findings of fact are not supported by substantial evidence. (Center's Brief at 5.) "Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Clites v. Dep't of Pub. Welfare*, 548 A.2d 1345, 1347 (Pa. Cmwlth. 1988). The "substantial evidence . . . may be circumstantial and based on inferences." *Brown Transp. Corp. v. Pa. Hum. Rels. Comm'n*, 578 A.2d 555, 560 (Pa. Cmwlth. 1990). As part of our review, we are mindful that "[i]t is not the function of a reviewing court to judge the weight of [the] evidence and credibility of witnesses on an appeal from an administrative agency." *Murphy v. Dep't of Pub. Welfare, White Haven Ctr.*, 480 A.2d 382, 387 (Pa. Cmwlth. 1984).

### 1. Mixed-Age Levels

The ALJ found that the Center violated Section 3270.52 of DHS's regulations, 55 Pa. Code § 3270.52, on two occasions. To better understand this violation, we note that DHS classifies children by their age level into six groups ranging from infant (birth to one year old), young toddler (one to two years old), older toddler (two to three years old), preschool (three years old to the date the child enters kindergarten), young school age (kindergarten to fourth grade), and older school age (fourth grade to the child's fifteenth birthday). 55 Pa. Code § 3270.4. When different age level children are grouped together, the age of the youngest child determines the appropriate staff-to-child ratio. 55 Pa. Code § 3270.52. DHS's age level distinctions determine the appropriate staff-to-child ratio for each age group: infants (one to four), young toddlers (one to five), older toddler (one to six),

preschool (one to ten), young school age (one to twelve), and older school age (one to fifteen).  55 Pa. Code § 3270.51.

Mr. Spencer observed that on May 2, 2019, there were two occasions where the Center was not in compliance with Section 3270.52 of DHS's regulations, 55 Pa. Code § 3270.52.  The Center did not dispute the violations, although it contended that DHS accepted its plan of correction which was implemented to correct the violations.  (AC at 10-11; C.R. at 124-25.)  Our review of the record indicates that the ALJ properly relied on the Center's admission to the violations, as well as Mr. Spencer's testimony at the hearing, which he recognized was consistent with Mr. Spencer's ISRs.  Consequently, we conclude that substantial evidence exists in the record to support the ALJ's conclusion that the Center violated Section 3270.52 on two occasions.

## 2.  Child and Adult Hygiene

The ALJ found that the Center violated Sections 3270.134(a) and 3270.152 of DHS's regulations, 55 Pa. Code §§ 3270.134(a) and 3270.152, which, respectively, require that "[a] staff person . . . ensure that a child's hands are washed before meals and snacks, after toileting[,] and after being diapered" and that "[a] facility person shall wash his hands before meals and snacks, and after toileting and after diapering a child."  The Center admitted to violating Section 3720.134(a) and Section 3270.152.  (AC at 11-12; C.R. at 125-26.)  Moreover, Mr. Spencer testified that, on April 24, 2019, he observed the violations.  The ALJ again relied on the Center's admission that the staff member did not wash her hands or the child's hands, as well as Mr. Spencer's testimony based on personal observations.  (AC at 11; C.R. at 125.)  We, therefore, conclude that substantial evidence exists in the record to

11

support the ALJ's conclusion that the Center violated Sections 3270.134(a) and 3270.152.

### 3. Supervision of Children

The ALJ found that the Center violated Section 3270.113(a) of DHS's regulations, 55 Pa. Code § 3270.113(a), which requires, in relevant part:

> (a) Children on the facility premises . . . shall be supervised by a staff person at all times. . . .
>
> (1) Each staff person shall be assigned the responsibility for supervision of specific children. The staff person shall know the names and whereabouts of the children in his assigned group. The staff person shall be physically present with the children in his group on the facility premises . . . .
>
> (2) The requirement for supervision . . . includes compliance with the staff: child ratio requirements in §§ 3270.51-3270.55 (relating to staff: child ratio).

55 Pa. Code § 3270.113(a). Section 3270.4 of DHS's regulations defines "supervise" as being "physically present with a group of children . . . [with] [c]ritical oversight in which the supervisor can see, hear, direct and assess the activity of the supervisee." 55 Pa. Code § 3270.4. Mr. Spencer testified that on May 2, 2019, he observed a school-aged child alone in the Center's lobby for approximately one to two minutes. Mr. Spencer described the physical layout of the Center's lobby to support DHS's contention that the Center's employees could not see into the lobby to supervise the child. The Center admitted to violating this regulation. (AC at 13; C.R. at 127.) The ALJ relied on the Center's admission to the violation and credited Mr. Spencer's testimony as supporting this violation. (AC at 12-13; C.R. at 126-27.) Again, we, therefore, conclude that substantial evidence exists in the record to support the ALJ's conclusion that the Center violated Section 3270.113(a).

12

## B. Alleged Errors of Law

### 1. Corrective Actions Taken After Violations

The Center argues that the ALJ improperly excluded evidence of its accepted plan of correction. (Center's Brief at 7.) The ALJ, relying on our decision in *Altagracia*, reasoned that any subsequent corrective action is irrelevant in determining whether a violation of DHS's regulation occurred. (AC at 10-11; C.R. at 124-25.) The Center contends that the ALJ's reliance on *Altagracia* is misplaced, because it concerned a family day care home rather than a day care center, and, as a family day care home, there was no availability of a provisional certificate. (Center's Brief at 7.) We do not believe the factual distinctions identified by the Center are consequential to the ALJ's reliance on *Altagracia*, particularly given that this Court has long held that corrective action taken after a regulatory violation is irrelevant in determining whether to revoke a license. *Holmes Constant Care Ctr. v. Dep't of Pub. Welfare*, 555 A.2d 282, 285 (Pa. Cmwlth.) (explaining that simply continuing to make corrections when violations are cited is not "compliance"), *appeal denied*, 562 A.2d 828 (Pa. 1989); *Dep't of Health v. Brownsville Golden Age Nursing Home, Inc.*, 520 A.2d 926, 936 n.7, 938-39 (Pa. Cmwlth.) (recognizing that efforts to cure deficiencies made after regulatory violation is found irrelevant), *appeal denied*, 529 A.2d 1083 (Pa. 1987); *Colonial Gardens Nursing Home, Inc. v. Dep't of Health*, 382 A.2d 1273, 1277 (Pa. Cmwlth. 1978) (finding no merit in nursing home's argument that presiding officer and department erred in imposing sanctions against nursing home without considering improvements allegedly implemented).

While the curing of deficiencies is important for the safety of the children and Center employees, "subsequent corrective actions do not erase the fact that a licensee was in violation of regulations on the date of inspection." *K.C. Equities*, 95 A.3d

13

at 930. For this reason, we conclude that the ALJ did not err when he excluded the Center's evidence of corrective actions taken in response to DHS's violations.

## 2. Hearsay Evidence

The Center contends that the ALJ committed an error of law when he sustained DHS's objection for hearsay and did not consider as evidence Mrs. Mendez's testimony explaining what the parent of the unsupervised child told her and Mr. Spencer after the discovery of the child in the Center's lobby. (Center's Brief at 13-14.) The crux of the Center's argument is that "Commonwealth agencies shall not be bound by technical rules of evidence at agency hearings, and all relevant evidence of reasonably probative value may be received." *D'Alessandro v. Pa. State Police*, 937 A.2d 404, 411 (Pa. 2007) (quoting 2 Pa. C.S. § 505). The Center submits that the statement of the parent of the unsupervised child was very relevant and probative to the circumstances and that Mr. Spencer heard but ignored the parent's explanation of how the child came to be unsupervised in the Center's lobby for a few minutes. (Center's Brief at 14.)

Hearsay is a statement, other than the one made by a declarant while testifying at a trial or hearing, offered into evidence to prove the truth of the matter asserted in the statement. Pa. R.E. 801(c). A "'[s]tatement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Pa. R.E. 801(a). A "'[d]eclarant' means the person who made the statement." Pa. R.E. 801(b). "Hearsay evidence is normally inadmissible at trial unless an exception provided by the Pennsylvania Rules of Evidence, [the Pennsylvania Supreme] Court's jurisprudence, or statute is applicable." *D'Alessandro*, 937 A.2d at 411 (citing Pa. R.E. 802).

In determining whether Mrs. Mendez's testimony was hearsay, we note that the mother of the unsupervised child (*i.e.*, the declarant) told Mrs. Mendez and Mr. Spencer the reasons why her child was left alone in the lobby (*i.e.*, she made a statement). The mother was not testifying at the evidentiary hearing, and the Center's attorney offered the mother's statement into evidence to prove the truth of the matter asserted. DHS's attorney, recognizing Mrs. Mendez's testimony was relying on the mother's out-of-court statement, objected to its admission as evidence.[12] The ALJ sustained DHS's objection on the basis of hearsay.

While it is true, as the Center argues, that Commonwealth agencies are not bound by technical rules of evidence at agency hearings, there are certainly limitations to what can be considered as evidence. This Court, in *Walker v. Unemployment Compensation Board of Review*, 367 A.2d 366 (Pa. Cmwlth. 1976), provided guidelines for when hearsay could be used as admissible evidence (*Walker* Rule) in an administrative proceeding. Under the *Walker* Rule:

---

[12] The Center's attorney at the hearing argued that Mrs. Mendez's testimony was not hearsay and was admissible as a "present sense impression." Pennsylvania Rule of Evidence 803(1) defines a "[p]resent [s]ense [i]mpression" as "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." The exception applies regardless of whether the declarant is available as a witness, and the "declarant need not be excited or otherwise emotionally affected by the event or condition perceived." Pa. R.E. 803(1), *Comment*. "The trustworthiness of the statement arises from its timing[,]" and the "requirement of contemporaneousness, or near contemporaneousness, reduces the chance of premeditated prevarication or loss of memory." *Id*.

The Court notes, however, that the Center does not argue that the present sense impression exception to the hearsay rule is applicable in this appeal, and, consequently, it is deemed waived. *See* Pa. R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part . . . the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent."); *In re Estate of Ryerss*, 987 A.2d 1231, 1236 n.7 (Pa. Cmwlth. 2009) (holding that arguments not properly developed in appellate brief will be deemed waived by this Court under Pennsylvania Rule of Appellate Procedure 2119(a)).

(1) Hearsay evidence, [p]roperly objected to, is not competent evidence to support a finding of [an agency][; and]

(2) Hearsay evidence, [a]dmitted without objection, will be given its natural probative effect and may support a finding of [an agency], [i]f it is corroborated by any competent evidence in the record, but a finding of fact based [s]oley on hearsay will not stand.

*Rox Coal Co. v. Workers' Comp. Appeal Bd. (Snizaski)*, 807 A.2d 906, 915 (Pa. 2002). Thus, the *Walker* Rule, while more liberal in its allowance of hearsay evidence for administrative proceedings, does not provide a different outcome in the present case. DHS objected and the ALJ sustained the objection. Following the *Walker* Rule, what the mother told Mrs. Mendez and Mr. Spencer cannot be considered competent evidence for the Center's case. If the Center wanted the mother's statement to come into evidence, it could have called the mother as a witness or, alternatively, provided an argument in this appeal that her statement constituted an exception to the hearsay rule. In the absence of either, the ALJ's evidentiary decision is correct and not an error of law.

### 3. Strict Compliance for Code and Regulations

The Center contends that the ALJ held Mrs. Mendez to strict compliance standards for the misconduct of her employees in failing to follow DHS's regulations and that DHS is in essence requiring her to guarantee that no mistake would ever occur by an employee. (Center's Brief at 5, 9.) We disagree.

"It is well[]established that duly authorized and promulgated regulations of an administrative agency have the force of law and are binding on the agency." *State Coll. Manor Ltd. v. Dep't of Pub. Welfare*, 498 A.2d 996, 998 (Pa. Cmwlth. 1985) (citing *Newport Homes, Inc. v. Kassab*, 332 A.2d 568, 574 (Pa. Cmwlth. 1975)). "[T]he establishment of these regulations involves agency discretion, and the court will not disturb administrative discretion in the absence of fraud, bad faith[,] or abuse

16

of power." *Id.* (citing *Travis v. Dep't of Pub. Welfare*, 277 A.2d 171, 174 (Pa. Cmwlth.), *aff'd*, 284 A.2d 727 (Pa. 1971)). Strict compliance with the requirements of the Code and DHS's duly promulgated regulations is mandatory and substantial compliance is insufficient. *Casey Ball Supports Coordination, LLC v. Dep't of Hum. Servs.*, 160 A.3d 278, 284 (Pa. Cmwlth. 2017) (quoting *State Coll. Manor Ltd.*, 498 A.2d at 998). Stated differently, a DHS-licensed facility must comply with applicable regulations every day, not just some or even most of them.

The purpose of DHS's Child Day Care Center regulations is "to provide standards to aid in protecting the health, safety and rights of children and to reduce risks to children in child care centers" and to "identif[y] the minimum level of compliance necessary to obtain [DHS's] certificate of compliance." 55 Pa. Code § 3270.2. In order for a legal entity to operate a child care facility in the Commonwealth, the entity must obtain a certificate of compliance from DHS, which is a "document . . . to operate a specific type of facility or agency, at a given location, for a specified period of time, and according to appropriate [DHS] program licensure or approval regulations." 55 Pa. Code § 20.4; *see also* 55 Pa. Code § 20.21 (concerning certificate of compliance application forms). A legal entity can be "[a] person, society, corporation, governing authority or partnership legally responsible for the administration and operation of a facility or an agency." 55 Pa. Code § 20.4; *see also* 55 Pa. Code § 20.13 (requiring legal entity to specify in writing at time of application or reapplication name of person responsible for daily operation of facility or agency). The record establishes that the Center, through its provisional certificate, was permitted to supervise up to 175 children, and Mrs. Mendez was identified as the individual responsible for the Center's daily operations. (C.R. at 34.)

17

DHS does not need to prove that Mrs. Mendez knowingly participated in or acquiesced to the regulatory violations levied against the Center. *See Aggie v. Dep't of Pub. Welfare* (Pa. Cmwlth., No. 484 C.D. 2014, filed December 30, 2014), slip op. at 11-12 (holding that "[t]o apply such rule would provide owners of licensed facilities with a blanket defense and discourage close monitoring of the activities at such facilities"); *McFarland v. Dep't of Pub. Welfare*, 551 A.2d 364, 367 n.6 (Pa. Cmwlth. 1988), *appeal denied*, 574 A.2d 74 (Pa. 1989) (DHS's refusal to renew certificate of compliance need not be supported by finding that day care provider willfully violated regulation). *Cf. Miller Home, Inc. v. Dep't of Pub. Welfare*, 556 A.2d 1, 4 (Pa. Cmwlth.) (holding DHS's revocation of personal care home license did not require legally responsible individual have personal knowledge of violation), *appeal denied*, 563 A.2d 889 (Pa. 1989); *Toms v. Bureau of Pro. & Occupational Affs.*, 800 A.2d 342, 349 (Pa. Cmwlth. 2002) (holding that no matter how well-intentioned, funeral home director violated applicable regulations). Even though Mrs. Mendez was not directly involved in her employees' actions that led to the regulatory violations, she managed the Center by controlling its policies, ensured that proper training was conducted, hired the employees who worked there, and most importantly, was the owner. In other words, the acts of the Center's employees are attributed to the Center for purposes of licensing.

We have no doubt that the Center's employees, like any other employee, make mistakes in the course of their employment that affect compliance with DHS's regulations. We are cognizant of the Center's argument that mitigating circumstances exist such that DHS should not have revoked its provisional certificate; for example, that its violations lasted less than five minutes, that the staff-to-child imbalance occurred because a Center employee departed the room, that

18

there was a policy that was not followed requiring the washing of the child's and employee's hands, and, perhaps most significantly, that a parent of a child violated the Center's policy requiring parents to accompany a child when entering the premises, resulting in an unsupervised child in the Center's lobby. Although the Center's employees may not have intended to violate DHS's regulations or the Center's policies, through human action (and inaction) they nevertheless created situations where DHS's regulations were violated.

Balanced against the Center's alleged mitigating circumstances, however, is that when the mistakes involve a child's health and safety or relate to efforts to reduce risks to children in child care centers, DHS has chosen to promulgate specific childcare regulations and require strict adherence to them. This Court will not disturb DHS's administrative discretion in the absence of fraud, bad faith, or abuse of power, and the record does not support that those actions occurred in this case. Further, Mrs. Mendez agreed to follow DHS's regulations when she applied for and received the Center's regular and provisional certificates of compliance, which is a necessary concession when operating a child day care facility in the Commonwealth. We conclude, therefore, that the ALJ did not err as a matter of law by holding the Center to a strict compliance standard with regard to DHS's regulations.

4. Seriousness of the Violation

The Center argues that the ALJ erred because DHS's revocation of the Center's provisional certificate is proper only where the "violation is so serious that the children were threatened with harm." (Center's Brief at 8.) The Center argues that DHS's revocation of its provisional certificate is not appropriate because "no harm came to any child." (C.R. at 78-80, 237, 253.) The Center solely relies on our decision in *Gibbs v. Department of Public Welfare*, 947 A.2d 233

19

(Pa. Cmwlth. 2008), *appeal denied*, 966 A.2d 572 (Pa. 2009), to support its argument. In *Gibbs*, we found that the caregiver of a family child day care home did not violate the Code when she delegated supervision of the children to an adult staff person who failed to watch them, resulting in a two-year-old child leaving the yard and crossing the street. *Gibbs*, 947 A.2d at 234, 237-38.

After deciding *Gibbs*, however, we explained that we "must look at each violation and the resulting punishment on a case-by-case basis." *Aggie*, slip op. at 12. In *Aggie*, we addressed the similar contention that DHS only "has the right to revoke a license based on a violation where a child is endangered, but it must allow for corrective action where it only charges technical violations." *Aggie*, slip op. at 14 (footnote omitted). In dismissing this argument, we reasoned:

> [Ms. Aggie] cites no authority for her distinction between technical violations and violations where a child is endangered. However, even if we agreed with [Ms. Aggie], we would still conclude that [DHS] was justified in refusing to renew her certificate of compliance here. The regulations that [Ms. Aggie] was found to violate concerned supervision of children both inside and outside the facility, children's hygiene, and proper communication to parents regarding incidents at the day care; the purposes underlying these regulations clearly relate to the health and safety of children and violations of these regulations could very conceivably endanger the welfare of the affected children. *The mere fact that none of the incidents at issue here resulted in an injury to a child does not absolve [Ms. Aggie] from any responsibility for the lapses at her facility or lessen [DHS's] authority to bring charges for such violations.*

*Id*. (emphasis added). The same reasoning applies to the Center's case. It is of significant import that the unsupervised child in the lobby of the Center had access through a door directly to the outside street in an urban environment. The fact that the child did not go outside while he was unsupervised and that no child suffered physical harm in this case does not absolve the Center of its responsibility for its admitted violations. DHS's regulations offer no distinction between "technical" and

20

"serious" violations, and any of the Center's admitted violations could have led to a situation where a child could have been physically harmed. Thus, we conclude that the ALJ did not err as a matter of law.[13]

## IV. CONCLUSION

Accordingly, we affirm the Chief Administrative Law Judge's decision, adopting the ALJ's adjudication and recommendation in its entirety.

_____
P. KEVIN BROBSON, President Judge

---

[13] Based on our disposition of the admitted violations, we need not address the merits of the Center's argument concerning the ALJ's conclusion that Mrs. Mendez used harsh, demeaning, or abusive language.

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Celeste Learning Center, :
                    Petitioner :
                                :
         v.                     : No. 518 C.D. 2020
                                :
Department of Human Services, :
                    Respondent :

**O R D E R**

AND NOW, this 20th day of December, 2021, the order of the Chief Administrative Law Judge of the Department of Human Services, Bureau of Hearings and Appeals, dated May 7, 2020, which adopted the recommendation of an Administrative Law Judge, thereby denying Petitioner's appeal, is AFFIRMED.

_____
P. KEVIN BROBSON, President Judge